USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 95-2102 UNITED STATES, Appellee, v. RICHARD D. MANGONE, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Bruce Green for appellant. ___________ Paul G. Levenson, Assistant United States Attorney, with whom _________________ Donald K. Stern, United States Attorney, and Victor A. Wild, Assistant _______________ ______________ United States Attorney, were on brief for appellee. ____________________ January 28, 1997 ____________________ BOWNES, Senior Circuit Judge. Defendant Richard D. BOWNES, Senior Circuit Judge. ____________________ Mangone was convicted after a lengthy jury trial on counts of conspiracy, bank fraud, unlawful receipt of monies by a credit union officer, and money laundering. He appeals both his conviction and the district court's decision to depart upward from the applicable Sentencing Guidelines range.  I  I Facts Facts _____ In order to understand the issues properly, a thorough recitation of the scope of defendant's criminal conduct is required. We relate the facts in the light most favorable to the verdict. See United States v. Wihbey, 75 ___ ________________________ F.3d 761, 764 (1st Cir. 1996). Between December 1985 and March 1991, defendant conspired with James Smith, Robert Cohen, and Ambrose Devaney to defraud two separate lending institutions, the Barnstable Community Federal Credit Union ("BCCU") and the Digital Employees Federal Credit Union ("Digital"). Defendant, president of Digital and a founder of BCCU, and Smith, a real estate developer and a founder of BCCU, were the primary organizers of the fraud. Robert Cohen was general counsel to both credit unions. Ambrose Devaney was a real estate developer on Cape Cod. This court's affirmance of the convictions and sentences of Smith, Cohen and Devaney is found at United States v. Smith, 46 F.3d 1223 ______________________ (1st Cir.), cert. denied, 116 S. Ct. 176 (1995). ____ ______ -2- 2 Defendant and Smith used their control over the two credit unions to obtain tens of millions of dollars in loans for their own speculative real estate ventures. The loans were used in part to finance the purchase of commercial real estate on Cape Cod, usually motel properties or raw land for residential subdivisions. The loans were, in many instances, funded in amounts far in excess of the purchase price of the property, with much of the excess going directly into the pockets of defendant, Smith, and Devaney. In order to avoid the credit union's policies restricting "insider" loans as well as policies limiting maximum borrowing by an individual, the conspirators formed over a dozen nominee trusts to create the fiction that the loans were going to many different borrowers. As president of Digital, which had experienced explosive growth since its founding in 1980, defendant enjoyed the confidence of that credit union's board of directors and staff. Defendant was therefore able to induce Digital to allocate approximately $20,000,000 for "investment" in participation loans with BCCU, without disclosing the fact that defendant himself was one of the ultimate borrowers of those funds. All of the participation loans were made to trusts owned by defendant and Smith (and in most cases Devaney). In each instance, the participation loans were funded in amounts far in excess of the actual purchase price of the commercial property. These excess -3- 3 funds, known as "pie," were siphoned off and diverted to accounts controlled by defendant or Smith for further distribution. The amount of "pie" varied but was generally between $75,000 and $200,000 per partner per loan. For all of the participation loans and for many additional loans, defendant and his co-conspirators concealed their ownership interests by placing in BCCU's and Digital's files phony certificates of beneficial interest, falsely naming certain individuals as beneficiaries of the trusts. In order to obtain loans well in excess of the purchase price of the property, defendant and Smith forged and altered purchase and sale agreements, often inflating prices by over one million dollars. For most of the participation loans, defendant, Smith, and Lynn Vasapolle, an unindicted co- conspirator, prepared fake financial statements to create the false impression that the putative borrowers (the "trustees") were wealthy individuals capable of repaying the loans being extended. Most of the participation loans were initially closed between December 1985 and October 1988, and were made with "interest only" notes for relatively short terms (1-2 years), with a balloon payment of the full principal due upon expiration. When they were unable to find legitimate buyers to whom they could sell the properties at a profit sufficient to cover both the original purchase price and the excess -4- 4 "pie" they had received, the conspirators began to pyramid their loans. Beginning in 1986, as loans came due on subdivision properties, Cohen would draw up papers "selling" a portion of the original subdivision to a newly created trust. Defendant and Smith would then cause BCCU to make a loan to the new trust to finance the purchase. The new loan proceeds would then be used to pay off the proportionate share of the prior loan. Purchase "prices" were again artificially inflated so as to provide cash which was used to cover interest payments on the new loans and to help with debt service on the existing loans. By March 1991, when BCCU was seized by the National Credit Union Administration, the outstanding balance of the Mangone-Smith-Devaney loans amounted to between forty and sixty million dollars.  On September 12, 1992, defendant, Smith, Cohen, and Devaney were indicted for conspiracy (18 U.S.C. 371) to commit bank fraud (18 U.S.C. 1344); unlawful receipt of monies by a credit union officer (18 U.S.C. 1006); and money laundering (18 U.S.C. 1957). The case was tried on a redacted indictment that included a conspiracy count, seven bank fraud counts, seven parallel unlawful receipt counts (which concerned defendant alone) and the money laundering -5- 5 charges. Defendant was convicted on all counts.1 Defendant fled prior to sentencing and remained at large for eighteen months before he surrendered. On September 12, 1995, defendant was sentenced to twenty-four years of incarceration after the district court departed upward by two years from the maximum sentence under the Guidelines.  II II The Bruton Error The Bruton Error ________________ Defendant appeals his conviction on the basis of alleged error under Bruton v. United States, 391 U.S. 123 _________________________ (1968). This issue has already been decided against defendant's co-conspirator Smith, who asserted a factually identical claim of Bruton error in his appeal, which we found ______ to have been harmless error. Smith, 46 F.3d at 1229-30. _____ Although we could dispose of defendant's claim on the ground of stare decisis, we provide a brief analysis. _____ _______ The Supreme Court held in Bruton that, because of ______ the substantial risk that the jury, despite instructions to the contrary, will look to a codefendant's incriminating extrajudicial statement in determining the defendant's guilt, admission of a codefendant's statement in a joint trial violates the defendant's right of cross-examination under the  ____________________ 1. Smith was also convicted on all counts. Cohen was convicted on all counts except for four money laundering charges. Devaney was convicted of conspiracy, three counts of bank fraud and one count of money laundering. Smith, 46 _____ F.3d at 1227. -6- 6 Confrontation Clause of the Sixth Amendment. Bruton, 391 ______ U.S. at 126. The evidentiary basis for the Bruton claim is ______ as follows.  On the last day of trial testimony, co-defendant Cohen called to the stand Professor Richard Huber, an authority on the professional responsibilities of attorneys. Testifying under the district court's limiting instruction that the testimony was relevant as to Cohen only, and had nothing to do with any of Cohen's co-defendants, Professor Huber reiterated the events of April 4, 1991, when Cohen met with him to obtain advice concerning his representation of BCCU, which by that time was in the hands of federal regulators. Huber testified that Cohen explained to him that Cohen's clients, "a former officer of the bank, a former director of the bank, and a bank manager came in and spoke to [Cohen] . . . concerning activities that involved them and their work at the bank." Smith, 46 F.3d at 1228. According _____ to Huber, Cohen stated that "certain documents had been changed, the information had been changed, figures had been changed, data had been changed, [and] that this had been done after preparation by Mr. Cohen and after they had been presumptively completed." Id.  ___ Like Smith before him, defendant asserts that Huber's testimony constitutes reversible Bruton error because ______ it "expressly implicate[s] the defendant, leaving no doubt -7- 7 that it would prove powerfully incriminating." Id. (internal ___ quotation marks and citations omitted)(alteration in original). In Smith, we assumed without deciding that the _____ admission of Huber's testimony constituted Bruton error, but ______ held that any such error was harmless beyond a reasonable doubt. 46 F.3d at 1229.  Relying on Chapman v. California, 386 U.S. 18 ______________________ (1967), and related cases, defendant argues strenuously that the error was not harmless. We disagree. We remain convinced that any Bruton error that may have occurred below2 ______ was harmless for the reasons stated in Smith:  _____ The jury convicted all the defendants on the conspiracy count, and Cohen on most of the substantive counts. Even if the jury threw the curative instructions to the wind and considered the stricken testimony as evidence against [Mangone],3 the scenario which implicates Bruton, it ______ could not have believed Cohen's claim that the unnamed clients confessed to him _________ at the close of the conspiracy. No one confesses to a partner in crime. Admittedly, Cohen's statement might tend to incriminate [Mangone] and Devaney by showing that the coconspirators met to discuss damage control. In this sense, however, the statement falls far outside the pale of the "powerfully incriminating" evidence that produces Bruton errors. Vasapolle had already ______ testified in detail to the  ____________________ 2. As we did in Smith, we "assume without deciding that the _____ district court correctly found that Bruton error had ______ occurred." Smith, 46 F.3d at 1229.  _____ 3. The name "Mangone" has been substituted for "Smith." -8- 8 coconspirators' meetings in the wake of the BCCU takeover. Thus, once Cohen's statement is considered as something other than an account of the codefendants' confessions, it becomes merely cumulative of the government's case and could not have produced Bruton ______ error. The right of confrontation ensures that a criminal defendant can cross- examine his or her accusers. Had Cohen testified to the confession himself, [Mangone's] cross-examination of Cohen would have sought to show that no confession ever occurred. The verdicts suggest that the jury, if it considered this evidence, found just that. The jury, even if it disregarded the limiting instructions, plainly did not believe Cohen's claim that his codefendants had confessed to him. It is clear, therefore, that any Bruton error was ______ harmless beyond a reasonable doubt. 46 F.3d at 1229-30 (footnote and citations omitted). Because there is no difference between defendant's claim of Bruton ______ error and the Bruton error asserted by Smith in his appeal, ______ we follow the holding of Smith and affirm defendant's _____ c o n v i c t i o n .  III III The Sentencing Appeal The Sentencing Appeal _____________________ At sentencing, the district court departed upward by two years from the maximum sentence allowed under the Sentencing Guidelines. Defendant appeals this departure on two grounds: (1) that the district court failed to provide him with notice of its planned departure, as required under Federal Rule of Criminal Procedure 32, as interpreted in -9- 9 Burns v. United States, 501 U.S. 129 (1991); and (2) that the ______________________ upward departure was impermissible as a matter of law. We begin our analysis with a recitation of the district court's procedure at sentencing. Indicating that it was following its "usual procedure," the district court stated that it would "go through mathematically the requirements of the Sentencing Guidelines, and if anyone, government or defense, disagrees with the numbers as I state them . . . we will then discuss and resolve the differences right at that time." After having verified that the defendant had read and understood the Presentence Report (PSR), the district court proceeded to calculate the applicable Guidelines sentence, assisted throughout by both the government and defense counsel. The district court scrupulously determined the applicability of each guideline and made certain that both government and defense agreed on the accuracy of the court's calculations.  The court then turned to the question of departure from the Guidelines, inviting argument from both government and defense. The government urged an upward departure of two years on the basis of defendant's eighteen-month flight from justice. Defense counsel argued against departing upward on the basis of flight, suggesting that modest credit should be given to defendant for surrendering, and that consideration should be given to defendant's age in weighing departure -10- 10 upward from an already lengthy sentence. The district court then provided defendant with an opportunity to address the court, during which defendant expressed remorse for his actions. The district court then announced the sentence: [T]his court sentences you to a total of 24 years in the custody of the United States Attorney General . . . . The total sentence of 24 years exceeds the maximum on the various counts of which you stand convicted. And, therefore, it's appropriate to explain the manner in which the sentence will be calculated and the counts on which it will be calculated. . . . . I depart upward not on the ground that the government has adverted to; I do not punish you for a crime, though you admit it here, for which you have never been indicted, and never been brought before a jury and never had the process of law. I depart upward solely because, in my judgment, having presided over this case, the egregiousness, evilness of your conduct, on each of the criteria considered by the Sentencing Guidelines taken in their entirety, takes you out of the heartland of the guidelines. I adopt the argument that, in effect, you max out under the guidelines at a sentence that undervalues the actual criminality of your conduct if it is an appropriate goal of the criminal justice system to punish. . . . . Mr. Mangone, you've ruined people's lives; lots of lives, people you don't even know. Being sorry to these various financial institutions isn't the half of it. That's the sentence of the Court. -11- 11 At the same time I'm not insensitive to the Draconian nature of this sentence. I believe it's appropriate in the circumstances and I arrive at it only after most careful reflection. That's the sentence of the Court. Notice Notice ______ The PSR contains no information which could be construed to provide notice to the defendant that the court was contemplating an upward departure based upon this particular ground. In fact, when the district court asked the government about the possibility that the Guidelines sentence undervalued defendant's criminality, the government expressly stated that "the guidelines adequately address the enormity of the offense here." In Burns the precise question was whether Fed. R. _____ Crim. P. 32(a)(1), now 32(c)(1), required the sentencing court to give notice to the parties of its intent to make sua ___ sponte departures from the Guidelines. Subdivision (c)(1) of ______ Rule 32 does not contain a specific notice provision but requires the district court to afford the parties "'an opportunity to comment upon . . . matters relating to the appropriate sentence' at the sentencing hearing." Burns, 501 _____ U.S. at 132. The Court observed, "In our view, it makes no sense to impute to Congress an intent that a defendant have the right to comment on the appropriateness of a sua sponte __ _______ ___ ______ departure but not the right to be notified that the court is __ __ ________ -12- 12 contemplating such a ruling." Id. at 135-36. The Court held ___ that before a district court can depart upward on a ground not identified as a ground for upward departure either in the presentence report or in a prehearing submission by the Government, Rule 32 requires that the district court give the parties reasonable notice that it is contemplating such a ruling. This notice must specifically identify the ground on which the district court is contemplating an upward departure. Id. at 138-39 (footnote omitted). The Burns rule has been ___ _____ incorporated into an application note to 6A1.2 of the Guidelines. Defendant challenges the district court's departure on the basis that he was not provided with notice of the court's intention to depart upward. Because the defendant failed to object to the lack of notice at the sentencing hearing, we review the district court's actions under the rigorous standard of "plain error" review. See United States ___ _____________ v. Jones, 1 F.3d 1167, 1170 (11th Cir. 1993)(lack of Burns _________ _____ notice subject to plain error review), cert. denied, 510 U.S. _____ ______ 1100 (1994); United States v. Lowenstein, 1 F.3d 452, 454 ____________________________ (6th Cir. 1993)(same). Fed. R. Crim. P. 52(b) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The -13- 13 Court in United States v. Olano, 507 U.S. 725 (1993), teaches ______________________ that the authority created by Rule 52(b) is circumscribed. There must be an "error" that is "plain" and that "affect[s] substantial rights." Moreover, Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Id. at 732 (quoting United States v. Young, 470 U.S. 1, 15 ___ _______________________ (1985)) (other citation omitted) (alteration in original). We now proceed with our Olano analysis. _____ There must, first of all, be an "error." "Deviation from a legal rule is 'error' unless the rule has been waived." Olano, 507 U.S. at 732-33. There can be no _____ doubt that there was a deviation from a legal rule in this case. As stated supra, Burns requires that "before a _____ _____ district court can depart upward on a ground not identified as a ground for upward departure either in the presentence report or in a prehearing submission by the Government, . . . the district court [must] give the parties reasonable notice that it is contemplating such a ruling." 501 U.S. at 138. This rule was completely ignored. We reject the government's contention that, because the PSR contained a full recitation of the defendant's criminal conduct, this put defendant on notice of the factors -14- 14 on which the court relied for the upward departure. If we accepted the government's theory, all defendants would be on notice as to any sua sponte departure so long as the ___ ______ departure was based on facts contained in the PSR. Under that theory the Court's holding in Burns would become _____ meaningless.  It is worth noting that the sentencing facts here are remarkably similar to those in Burns. In Burns, at the _____ _____ conclusion of the sentencing hearing, the district court announced that it was departing upward from the Guidelines sentencing range, despite a statement in the PSR that "'[t]here are no factors that would warrant departure from the guideline sentence.'" Id. at 131 (quoting PSR). There ___ was a similar statement in the PSR in this case.  The next question is whether the rule was "waived" or "forfeited." Olano teaches that "[w]aiver is different _____ from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" 507 U.S. at 733 (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). _________________ In the case at bar there was a forfeiture, the failure to make the timely assertion of a right, but no waiver. "If a legal rule was violated during the district court proceedings, and if the defendant did not waive the rule, then there has been an 'error' within the meaning of Rule -15- 15 52(b) despite the absence of a timely objection." 507 U.S. at 733-34. We have no difficulty finding error. Following Olano, we determine whether the error was _____ "plain," which is defined as "synonymous with 'clear' or, equivalently, 'obvious'." Id. at 734. We think the error ___ here easily fits within the definition of plain error. Our next inquiry is whether the plain error affected the substantial rights of the defendant. Id. at ___ 734. We think it did. An increase of two years in time spent behind bars cannot help but affect one of the most precious rights an individual has, to live in freedom. Accordingly, we find that the district court's plainly erroneous departure affected the defendant's substantial rights. Cf. United States v. Miranda-Santiago, 96 F.3d 517, ___ __________________________________ 531 (1st Cir. 1996) (finding a case in which "the claimed error could well have an impact on the length of defendant's incarceration" to present a "compelling case" for the application of the plain error doctrine). Our final step in the Olano analysis is to _____ determine whether we should, in our discretion, order correction of this plain error that affects substantial rights. As Olano points out, "Rule 52(b) is permissive, not _____ mandatory." 507 U.S. at 735. The standard that should guide us in the exercise of our remedial discretion is whether the error "'seriously affect[s] the fairness, integrity or public -16- 16 reputation of judicial proceedings.'" Id. at 736 (quoting ___ United States v. Atkinson, 297 U.S. 157, 160 (1936)) ____________________________ (alteration in original). We think this standard has been met here. When a district court fails to follow a rule established by the Supreme Court, even though such failure was not intentional, there is bound to be an adverse effect on the fairness, integrity, and public reputation of judicial proceedings. Prior notice is one of the most zealously guarded rights of criminal defendants. It is embodied in the Due Process Clause of the Fifth Amendment. In Burns, the _____ Court stated, "In this case, were we to read Rule 32 to dispense with notice, we would then have to confront the serious question whether notice in this setting is mandated by the Due Process Clause." 501 U.S. at 138. The singular importance of such notice in the criminal arena means that disregard for it cannot help but have a denigrating effect on the fairness, integrity, and public reputation of judicial proceedings. It must be noted that the district court expressly refused to depart upward on the basis of defendant's flight before sentencing. This was within his discretion. For the foregoing reasons the conviction is affirmed and the sentence of the district court is reduced by two years, the amount of additional time imposed pursuant to the unlawful upward departure. The total sentence of -17- 17 incarceration to be served is twenty-two years. The judgment shall be so modified. So Ordered. So Ordered. ___________  - Concurring Opinion Follows - - Concurring Opinion Follows - -18- 18 STAHL, Circuit Judge (concurring). I concur with STAHL, Circuit Judge (concurring).  _____________ my brethren that the failure to comply with the requirements of Fed. R. Crim. P. 32(c)(1) warrants a vacatur of Mangone's sentence. The right to prior notice embodied in that rule, however, affords a party the opportunity to comment upon the appropriate sentence; it does not guarantee a lesser one. Unlike the majority, therefore, I would remand the case to the district court for resentencing consistent with this opinion. -19- 19