UNITED STATES, Appellee,

v.

Ricardo TORRES–GALINDO, a/k/a
Ricky Silva, Defendant,
Appellant.

United States, Appellee,

v.

Ricardo L. Guilbe–Sanchez,
a/k/a Richard La Sombra,
Defendant, Appellant.

Nos. 99–1013, 99–1014.

United States Court of Appeals,
First Circuit.

Heard Jan. 4, 2000.
Decided March 22, 2000.

Lydia Lizarríbar–Masini, by appointment of the Court, for appellant Ricardo Torres–Galindo.

Gustavo A. del Toro, by appointment of the Court, for appellant Ricardo Guilbe–Sánchez.

Jeanette Mercado–Ríos, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, Jorge E. Vega–Pacheco, Assistant United States Attorney, Chief, Criminal Division, and Camille Vélez–Rivé, Assistant United States Attorney, were on brief, for appellee.

Before TORRUELLA, Chief Judge, BOUDIN and LYNCH, Circuit Judges.

TORRUELLA, Chief Judge.

Ricardo Torres–Galindo and Ricardo L. Guilbe–Sánchez appeal their convictions for the carjacking of Jeanette Carmona–Hernández, which resulted in her death, and for the use of a firearm in a crime of violence. We affirm their convictions.

## I. FACTUAL BACKGROUND

On the evening of January 30, 1997, Alexander Figueroa–Delgado and Miguel González–Adams were together at the López–Nussa housing project. Appellants Torres and Guilbe arrived and suggested that the group go out and "take a car." Figueroa agreed to join appellants, but González was instructed to go home and wait for appellants and Figueroa to pick him up once they had acquired a vehicle.

After initially considering carjacking a vehicle near López–Nussa, appellants and Figueroa caught a ride with a friend to Ponce. Once there, appellants and Figueroa considered carjacking or attempted to carjack as many as five other vehicles over the course of the evening, without success. Appellant Torres then noticed a girl, Carmona, sitting alone in a Nissan Pathfinder parked at a garage.

Appellants and Figueroa approached Carmona's vehicle, armed with a .32 caliber pistol and a .38 caliber revolver. Carmona was ordered out of the car but refused to comply, at which time she was forced to the passenger seat and her assailants boarded the vehicle. Guilbe drove, and Torres and Figueroa sat in the back seat.

Appellants and Figueroa then began to drive around the Ponce area with Carmona in the car. Guilbe initially drove to an outlying area where Carmona was ordered out of the vehicle. However, Carmona was frightened and told her carjackers that she was afraid to be left there. She got back into the Pathfinder, and they drove away. Guilbe drove to a garage where Torres bought gas and cigarettes with Carmona's money. Next, they drove

to a drug point where Guilbe purchased heroin and Carmona was moved to the back seat of the vehicle.

After using the heroin, appellants and Figueroa, with Carmona still in the car, picked up González as previously planned. When González entered the vehicle, Guilbe was still driving, and Torres was in the passenger seat with the .38 caliber gun. Figueroa, with the .32, and González both sat in the back with Carmona.

Guilbe next drove to downtown Ponce, where González stole the license plate from another vehicle and put it on the Pathfinder. After a brief stop at another housing project, appellants, Figueroa, and González attempted unsuccessfully to rob a drug point. Afterward, Guilbe drove to a gas station, and they bought gas and bubble gum with money taken from Carmona's purse.

At some time during this period, Figueroa suggested to Torres that Carmona should be killed so that she would not reveal their identities. Carmona became nervous. Guilbe stopped the vehicle alongside the road in a remote area. Carmona was ordered out of the car, and González led her by the shoulder to the side of the road and ordered her to cross a railing. As she did so, Figueroa shot at her several times with the .38 caliber revolver. As Carmona screamed in pain and fear, Torres walked over to her, leaned over the rail, and shot her in the head, silencing her.

When Torres returned to the car, he told the others that he had shot Carmona in the forehead, and the four of them agreed to keep their crime a secret. After fleeing the scene of the crime, the four men burned all of Carmona's belongings, including the papers from the vehicle's glovebox. Torres and González removed the Pathfinder's seats, speakers, spare tire, and other items. Guilbe tried to remove his fingerprints from the steering wheel and door using his shirt. Then they drove to the outskirts of Ponce and, plac-

ing a screwdriver on the accelerator, sent the Pathfinder plummeting over a cliff.

Carmona's body was found the following day along the roadside, with several gunshot wounds to her head and arm. The Pathfinder was recovered a week later.

At trial, Figueroa and González testified for the government as part of their cooperation agreements with the United States Attorney's Office. In addition to their highly incriminating testimony, Special Agent Daryl Huff of the FBI testified about his investigation of the crime and, in particular, about the statements made by appellants and by the two cooperating witnesses while in custody. After sixteen days of trial, the jury found appellants each guilty on both counts of the indictment. The court later sentenced them each to life in prison on Count I and sixty years' imprisonment on Count II, to be served consecutively, in addition to restitution and a monetary assessment against each appellant.

## II. LAW AND APPLICATION

### A. *Sufficiency of the Evidence*

■ Appellants' first claim is a strained argument that there was insufficient evidence upon which the jury could have found them guilty. The gist of their argument is simply that cooperating witnesses Figueroa and González are such bad people that they cannot be believed. They were believed, however, by the jury, and we decline to overturn the jury's verdict on the record presented to us on appeal.

■ We review Rule 29 decisions *de novo*. See *United States v. Hernández*, 146 F.3d 30, 32 (1st Cir.1998). The test we apply is whether, considering the evidence as a whole and in the light most favorable to the prosecution, a rational trier of fact could have found guilt beyond a reasonable doubt. See *United States v. Alicea–Cardoza*, 132 F.3d 1, 5 (1st Cir.1997). We resolve all issues of credibility in favor of the verdict, *see United States v. Winter*, 663 F.2d 1120, 1127 (1st Cir.1981), and we

have held that the uncorroborated testimony of a cooperating accomplice may sustain a conviction so long as that testimony is not facially incredible, *see United States v. Rosario–Díaz,* 202 F.3d 54, 67 (1st Cir. 2000).

Applying this standard to the present case, there is no question that the United States presented sufficient evidence for the jury to find appellants Torres and Guilbe guilty beyond a reasonable doubt on both counts of the indictment. The testimony of Figueroa included detailed accounts of appellants' participation in the carjacking and killing of Carmona. Figueroa's testimony alone could have supported the verdict reached by the jury. *See id.* However, his testimony was corroborated in part by the testimony of cooperating witness González and extensively by Agent Huff's account of his investigation and the custodial statements of appellants. Other details of the crime were corroborated by Carmona's sister, who saw her parked at the gas station a short time before her abduction, and by the owner of the license plate that was stolen and affixed to the Pathfinder.

The thrust of appellants' challenge to all of this evidence is that witnesses Figueroa and González were bad people who should not be believed. However, the jury was presented with substantial evidence of the criminal histories of both men, including ample cross-examination, and chose to accept their version of the facts, at least in its core elements, after careful and proper instruction by the court noting the cooperation agreements between the cooperating witnesses and the government. The testimony of the two cooperating witnesses, which was corroborated by that of Agent Huff, was clearly not "insubstantial" or "incredible" on its face, and we therefore hold that there was sufficient evidence for the jury to convict both appellants.

### B. *Improper Vouching*

Appellants next raise two "vouching" arguments. First, they claim that testimony by FBI Agent Huff constituted improper vouching. Second, appellants claim that the Assistant United States Attorney made improper remarks during her closing argument that amounted to improper vouching for Agent Huff's credibility. Although we find some merit in each claim, we hold that any error was harmless.

### 1. Agent Huff's Testimony

■ We review the admission of alleged vouching testimony under the harmless error standard. *See Rosario–Díaz,* 202 F.3d at 65. It is well established that prosecutors may not place the prestige of the United States behind a witness by making personal assurances of credibility or by suggesting that facts not before the jury support the witness's account. *See id.* Likewise, the prosecution may not accomplish such improper bolstering through the testimony of other government witnesses. *See id.*

Recently, in *Rosario–Díaz,* we found that the United States had engaged in improper witness bolstering when the same Special Agent Huff, upon examination by the prosecution, testified that some of a cooperating witness's statements were "lies" while suggesting that others had been tested for reliability. *See id.* at 65–66. Although, on the record of that case we held that the improper testimony was harmless error, we warned government prosecutors that they would "tread on thin ice indeed if they continue[d] to practice this technique [of examination] in the future." *Id.* at 66.

■ We are again troubled by the testimony of FBI Special Agent Huff. Appellants note one exchange in particular that we think pushes the line of propriety. During Agent Huff's testimony about the custodial statements of appellant Guilbe, the following exchange took place between the prosecutor and Agent Huff:

Q: You've been an FBI agent for how long?

A: Just a little over ten years.

Q: And during those ten years or so, have you interviewed many suspects?

A: Numerous.

Q: Okay, and during those interviews, sir, has it been common or uncommon to have a suspect first deny and then admit involvement in a crime?

[Defense objection overruled by district court.] .

A: Okay, it is difficult for me to remember a time when a defendant or a suspect in a case has immediately told me the truth, it's very rare that that happens. Most of the time they always start with a lie. No, I had nothing to do with it. I don't know anything about it. I was elsewhere. I was with so and so. I was with someone else. And then when you pressure them they can't give you the name of the other people. They won't give you the name of the other people.

Trial Tr. May 13, 1998, at 42–43. The defendants contend that this exchange between the prosecutor and Agent Huff constituted improper vouching. Prosecutors may not, either through their own statements or through the testimony of government witnesses, "place the prestige of the United States behind a witness by making personal assurances about the credibility of a witness or by indicating that facts not before the jury support the witness's testimony." *Rosario–Díaz*, 202 F.3d at 65. We are not convinced that what happened here amounted to improper vouching. But we agree for somewhat different reasons that it was dubious testimony and should on a proper objection probably have been excluded.

Strictly speaking, Huff did not state that he personally believed Guilbe's confession rather than his denial, nor did Huff indicate that he was aware of facts not before the jury that confirmed the truth of Guilbe's confession. Rather, Agent Huff's challenged testimony sought to bolster Guilbe's confession by describing a pattern in which interrogated guilty defendants often deny their guilt initially but then confess. This purported to be a factual generalization based on specific but unidentified instances of defendant interviews that Agent Huff conducted during his ten years as an FBI agent. There are several different grounds on which this testimony might be thought objectionable.

The pattern that Agent Huff purported to describe is essentially the stuff of expert opinion testimony and even if Huff were regarded as an expert, we doubt whether this is testimony that could properly be regarded as helpful to a jury, *see* Fed. R.Evid. 702, which out of its own experience may know that persons accused of wrongdoing often deny their guilt before confessing. Further, any effort to test the basis for Agent Huff's opinion by examining the individual instances involving *other* confessions in the prior ten years obviously created a threat of a distracting exploration of the facts in unrelated cases. *See* Fed.R.Evid. 403. And all this assumes that the government has complied procedurally with its duties in respect of expert testimony. *See* Fed.R.Crim.P. 16(a)(1)(E).

■ However, even assuming that Agent Huff's testimony was inadmissible and a timely objection to it was made on proper grounds, it was harmless error. The essential inquiry in harmless error review is whether the improperly admitted evidence likely affected the outcome of trial. *See United States v. Rosales*, 19 F.3d 763, 767 (1st Cir.1994). We think that Agent Huff's testimony did not likely affect the jury's verdict in this case, for the following reasons.

First, Agent Huff was extensively cross-examined by defense counsel, and his testimony was challenged by the defense during closing arguments as well. On the whole, the credibility of Agent Huff and the custodial statements attributed to appellants were fully explored by the parties and presented to the jury for its evaluation.

Second, the weight of the evidence against appellants in this case is simply so

great that the jury is exceedingly unlikely to have been swayed by the challenged testimony of Agent Huff. Testimony from appellants' two accomplices, corroborating testimony from third parties and from Agent Huff, and even appellants' own self-inculpatory statements all supported the jury's finding of guilt beyond a reasonable doubt. We consider it highly unlikely that the omission of this particular testimony by Agent Huff would have led the jury to view all of that evidence differently and acquit appellants. Consequently, we hold that admission of Agent Huff's improper testimony was harmless error.

### 2. Prosecutor's Remarks During Closing Argument

■■ Improper arguments to the jury during closing that do not implicate constitutional rights constitute reversible error only if the argument is both inappropriate and harmful. *See United States v. Wihbey*, 75 F.3d 761, 772 (1st Cir.1996). Improper remarks are considered harmful if, considering the totality of the circumstances, they are likely to have affected the jury's verdict. *See id.* In determining whether a prosecutor's remarks to the jury amount to reversible error, the Court may consider the severity of the misconduct, whether it was deliberate or accidental, the context in which it occurred, the likely effect of any curative instructions, and the strength of the evidence against the defendant. *See id.*

■ Appellants object to the Assistant United States Attorney's statement during closing arguments to the following effect:

Now, if you recall, Agent Huff said that he's been an FBI agent for ten years. Defense will have you believe that the statement by "La Sombra" [appellant Guilbe] is not so. In that case you would also have to believe that he would actually jeopardize those ten years.

One might argue about whether this constituted improper vouching. There is no statement of personal belief by the prosecutor, and the reference to Huff's decade of service as an agent was based on the record. On the other hand, the reference to "jeopardize" suggests some knowledge outside the record of punishment that Huff could receive for lying in court. But none of this addresses squarely the underlying problem.

In substance, the prosecutor's argument is a fairly familiar one—an appeal to the integrity of police officers or federal agents. The reaction of judges in past cases is instructive: for the most part, they are somewhat uneasy about these appeals but often avoid a clear-cut answer as to whether they are permissible by treating the remarks as not very serious and, if viewed as improper, not sufficiently prejudicial on the particular facts or not plain error where no objection was made.[1]

■ To put the matter to rest in this circuit—so far as any such issue can be treated in the abstract—we hold that this kind of general appeal to believe the police or FBI because of their history, integrity, or public service is inappropriate, although not the worst offense that a prosecutor can commit. While not vouching in the most familiar sense, it does invite the jury to rely on the prestige of the government and its agents rather than the jury's own evaluation of the evidence; to this extent, the argument presents the same danger as outright vouching. *See United States v. Young*, 470 U.S. 1, 18–19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

Nevertheless, we hold that the prosecutor's comment here was harmless, given (1) that it was not a severe infraction, (2) that the court properly instructed the jury that the statements and arguments of counsel are not evidence, and (3) the sub-

---

1. *See, e.g., United States v. Marshall*, 109 F.3d 94, 99–100 (1st Cir.1997); *United States v. Wihbey*, 75 F.3d 761, 772 (1st Cir.1996); *United States v. Bethancourt*, 65 F.3d 1074, 1079–80 (3d Cir.1995), *cert. denied*, 516 U.S. 1153, 116 S.Ct. 1032, 134 L.Ed.2d 109 (1996); *United States v. Davis*, 831 F.2d 63, 66–67 (5th Cir.1987).

stantial weight of the evidence against appellants.

■ Finally, the prosecutor's reference during closing argument to the order of the custodial statements made to Agent Huff presents less of an issue, and we find no wrongdoing by the government in this regard. The prosecutor's reference to this was made in response to the explicit argument of defense counsel during closing that the testimony of the cooperating witnesses was uncorroborated. Furthermore, the reference was to *facts in the record.* The prohibition of improper vouching is intended to keep the government from inviting a verdict based on facts not before the jury or on a prosecutor or government witness's personal assurance of credibility. *See Rosario–Díaz,* 202 F.3d at 64. The prosecution's reference to the dates of appellants' statements presents no such danger, and it was not improper.

## C. *Bruton Issues*

■ Appellants claim that the district court improperly allowed evidence in violation of the Supreme Court's ruling in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which bars the admission of explicitly incriminating statements by one defendant against a codefendant. *See United States v. Mangone,* 105 F.3d 29, 32 (1st Cir.1997). We review such claims for harmless error. *See Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

■ First, the sketch challenged by appellants presents no *Bruton* issue, because it was never introduced into evidence or otherwise presented to the jury. It appears that the sketch was discussed only at a bench conference, at which the prosecutor announced that the sketch would not be used. Because the jury was never presented with the sketch, it does not present the danger of unduly prejudi-

cial incrimination with which the *Bruton* decision was concerned. *See Mangone,* 105 F.3d at 32.

■ Appellants' second *Bruton* claim is that the district court erred in permitting Agent Huff to testify about appellants' custodial statements. Because appellants failed to raise this objection below, we review the admission of the testimony for plain error. *See United States v. Awon,* 135 F.3d 96, 103 (1st Cir.1998). In any event, there was no violation here, because Agent Huff properly omitted any incriminatory reference to appellant Torres in his recounting of appellant Guilbe's custodial statement, and likewise omitted all incriminatory references to Guilbe in his recounting of Torres's statement. Such "sanitized" evidence is admissible under *Bruton. See United States v. Cleveland,* 590 F.2d 24, 27–28 (1st Cir.1978).

## D. *Use of the FBI 302's*

■ Appellants claim that the district court erred in permitting Agent Huff to consult FBI Form 302's [2] while testifying. Appellants assert that the information in the 302's was inconsistent with the notes taken by the agent during the custodial interviews. However, appellants cite no case or rule as a basis for their claim, and we find no error.

The district court permitted Agent Huff to refer to the 302's as a means of refreshing his recollection only. The forms were not admitted into evidence. Furthermore, Agent Huff was subjected to extensive cross-examination on the inconsistencies between the 302's and his notes of the interviews. His explanation of the discrepancies was not unreasonable, and the limited use of the 302's presented no fundamental unfairness or undue prejudice, simply an issue of credibility which was properly left for the jury's assessment.

---

**2.** Agent Huff testified that a Form 302 is prepared by an agent after an interview based on the agent's recollection of the interview, that other agents may assist in the preparation of the 302, and that the 302 is prepared in anticipation of prosecution.

### E. *Fifth Amendment Claim*

 Finally, appellants argue almost in passing that their Fifth Amendment rights were violated by the FBI's practice of not recording confessions, preferring instead to rely on the testimony of the interviewing agent. While the Court recognizes that this practice is susceptible to abuse, the appellants have offered us no evidence or argument that would indicate any impropriety in this case. Nor have they articulated how such impropriety, were it present, might constitute a violation of their Fifth Amendment rights. Even if we shared appellants' frustration with the FBI's practice,[3] the claim is without merit.

### III. CONCLUSION

In conclusion, we hold (1) that there was sufficient evidence to support the jury's guilty verdict against both appellants on both counts; (2) that the prosecutor's remarks during closing were proper except for one harmless instance of improper bolstering and that Agent Huff's testimony was in one respect arguably improper but also harmless; (3) that there were no *Bruton* violations; (4) that the district court did not err in permitting Agent Huff to refresh his recollection with the FBI Form 302's; and (5) that appellants failed to demonstrate that their Fifth Amendment rights were violated by the FBI's failure to record their custodial statements.

**Affirmed.**

---

**3.** This writer feels there is little doubt that accurate, contemporaneous recording of custodial statements would facilitate the truth-seeking aims of the justice system, and it would also facilitate review on appeal. Given the inexpensive means readily available for making written, audio, and video recordings, the failure to use such devices may raise some interesting issues. Absent a proven violation of rights in this case, however, it is not a matter within our power to pass upon.