State                                  :

            v.                         :

Antonio O. Whitfield.                  :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  | : |  |
| State | | |
| | : | |
| v. | : | |
| | : | |
| Antonio O. Whitfield. | : | |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.** This case stems from the brutal, late-night beating of a young man that occurred on the East Side of Providence. The complainant suffered a head wound that required eight stitches, a severe concussion, a broken nose, and multiple lacerations and contusions over his entire body. After a four-day jury trial, the defendant, Antonio O. Whitfield (Whitfield or defendant), was convicted of two counts of assault with a dangerous weapon and one count of simple assault for his role in the fracas. On appeal, the defendant argues that (1) the trial justice abused his discretion by allowing the state to impeach his credibility with fourteen prior criminal convictions and (2) the trial justice erred by denying defense counsel's motion to pass the case after the prosecutor allegedly vouched for the credibility of two witnesses during her closing argument. The parties appeared before this Court on February 25, 2014, pursuant to an order directing them to show cause why the issues raised in this appeal should not summarily be decided. We are satisfied that cause has not been shown and that the appeal may be decided at this time. For the reasons that follow, we affirm the convictions.

**Facts and Travel**

Michael Newell (Newell or complainant) lived in a third-floor apartment on Angell Street in Providence. The basement of the building housed a club: the Liquid Lounge. At approximately 3:30 a.m. on November 27, 2008, a friend of Newell's—a bouncer at the Liquid Lounge—knocked on his door and asked whether Newell had a wire coat hanger because another Liquid Lounge employee, named Kelsey, was locked out of her car. Although he could not find a wire hanger, Newell went outside to assist Kelsey with her attempts to access her vehicle, which was parked in the driveway adjacent to the building.

Within minutes, Newell watched as another female employee left work and began walking down Angell Street toward her car. She did not walk far. A black Dodge Charger stopped on Angell Street and the occupants began shouting catcalls at the woman, who immediately turned around and began walking back toward the group gathered in the vicinity of Kelsey's car, which included the complainant, Kelsey, three Liquid Lounge bouncers, and two patrons. Undeterred, the Charger reversed direction and pulled into the driveway where the group was standing. At that point, Newell and the bouncers told those in the Charger to leave. According to Newell, rather than depart, the occupants of the Charger responded by hurling unopened beer bottles at them from the rear driver's side window.

Newell testified that as he approached the rear driver's side door of the Charger, he was pulled through the window of the vehicle, and the Charger backed out of the driveway and sped forward about 150 feet. When the vehicle came to a stop, the door opened, and Newell fell to the ground. As he attempted to stand, he was struck in the temple with an unopened beer bottle and again fell to the ground. Newell was repeatedly kicked and stomped on his head and upper body by three individuals for an extended period of time. Newell testified that he knew that there were

three assailants during the attack because there were distinct sets of legs and feet simultaneously assaulting him; however, he could not see the faces of his attackers.[1]  According to Newell, the bouncers finally reached the Charger and attempted to intervene.  Eventually, the police arrived on the scene; Newell was transported to Rhode Island Hospital, where he received eight stitches around his temple.  Newell also suffered "a severe concussion, a broken nose, and multiple lacerations and contusions from head to toe."

A Providence police officer and a Brown University security officer responded to the melee: Providence police officer Joshua Greeno (Officer Greeno) and Brown University security officer Nicholas Gonsalves (Gonsalves).  Gonsalves was on foot patrol—checking the University's Environmental Lab—when he heard a loud commotion coming from Angell Street.  Gonsalves testified that as he walked toward the noise, he saw a Dodge Charger stopped in the middle of the road and that individuals in the car and on the sidewalk were shouting at each other.  Gonsalves testified that a beer bottle was thrown from the rear of the vehicle towards Newell, who was standing on the sidewalk.

Gonsalves then saw Newell approach the vehicle "towards the rear window" and "actually go into the vehicle," at which time the car started to move and then abruptly stopped.[2]  Gonsalves testified that three men exited the vehicle: "[t]he driver, * * * a lighter-skinned male; a rear passenger, * * * also a lighter-skinned male; and a darker-skinned male, [from] the front passenger side, who later identified himself to police as Keeron Hardmon."  "Keeron Hardmon" was later identified as defendant, Antonio Whitfield.  Gonsalves made an in-court identification

---

[1] Newell also admitted that he had consumed about eight beers that night.

[2] It is not clear from the direct examination of Gonsalves whether he was referring to the driver's or passenger's side rear window.  Furthermore, in contrast to Newell's testimony, during his cross-examination, Gonsalves testified that the car moved only one to two feet forward.

of defendant.[3] Gonsalves testified that defendant threw a beer bottle at Newell, striking him in the face. He next saw a white male approach the vehicle from the sidewalk, and a fight ensued between Newell, defendant, "the other darker-skinned male," and the white male who had just approached.[4] Gonsalves testified that defendant and "the other male" got Newell and the other man onto the ground and began kicking them; the kicks were so forceful that Gonsalves could hear "knocking sounds" from his vantage point fifty feet away.

According to Gonsalves, he did not approach the fracas because his job was limited to that of a security officer with no arrest power; however, he broadcast a call to Brown University police. Within minutes, a police cruiser approached with audible sirens. At that point, Gonsalves saw two assailants return to the vehicle, while defendant fled on foot. The vehicle was stopped by police, and a Brown University police unit located defendant and brought him back to the scene for a show-up. Gonsalves identified him as one of the assailants.

While these events were unfolding, Officer Greeno arrived on the scene to find Newell on the ground. He then learned that the black Dodge Charger had been stopped by the police a short distance away, with two suspects in the vehicle and that the third suspect also had been apprehended.

After the close of the state's case, defendant's motion for judgment of acquittal was denied by the trial justice. Before the start of the defense's case, defense counsel inquired about whether the state intended to introduce defendant's prior convictions, in the event he testified on

---

[3] For clarity, when the officers refer to "Keeron Hardmon," we will refer to that person as defendant because no identity issue was raised and defendant later admitted to having an ID bearing that name.

[4] It is unclear who the "other darker-skinned male" is, given that Gonsalves initially testified that two "lighter-skinned" males and only one "darker-skinned male"—whom he identified as defendant—exited the vehicle.

his own behalf. The state sought to admit fourteen prior convictions, and defendant argued that the convictions were inadmissible under Rule 609 of the Rhode Island Rules of Evidence. The trial justice, however, overruled defendant's motion and allowed the prior convictions in accordance with Rule 609.

The defendant testified in his own defense and gave an account of the events that markedly differed from the state's case. According to defendant, in the early morning hours of November 27, 2008, he had just left a club in Providence with two friends: Mario and Kenny. As Kenny proceeded down Angell Street, Mario was trying to talk to a girl, but she "was running away from something." According to defendant, Kenny then reversed direction and pulled into a parking lot where there was a group of men. The defendant testified that the group of men started hitting the car and yelling obscenities. The defendant contends that, while he sat in the rear driver's side seat, someone hit him in the face and then tried to pull him through the window. He did not, however, identify that man as Newell. At the same time, a similar altercation began through the front passenger window, but that passenger—presumably Mario— got out of the car. The defendant testified that he was unable to exit the vehicle because of the child locks, but that the door was opened from the outside. At that point, according to defendant, a fight erupted with him and Mario against four or five other people. The defendant admitted that he had a beer bottle in the car, but testified that it fell to the ground when he was pulled partially through the window. He denied throwing a beer bottle or striking anyone with it. The defendant testified that, during the altercation, he turned around "like when everybody went to go run back to the car, because there [were] so many other people, [and] the car was gone, Kenny had left." Knowing that the police were coming, defendant testified that he ran away because he knew he had an outstanding warrant for failure to pay court fines.

On cross-examination, defendant's credibility was impeached through the introduction of his fourteen prior criminal convictions. The trial justice immediately gave a limiting instruction, informing the jury that evidence of defendant's prior convictions could only be considered in relation to his credibility and not for propensity purposes. Additionally, on cross-examination, defendant stated that he did not give the police the name "Keeron Hardmon," but that he had his cousin's ID in his pocket, and the police took that ID as his. The defendant admitted that he did not correct the police officers' misimpression regarding his identity because he was aware of the outstanding warrant for his arrest.

On two occasions during the prosecutor's closing arguments, defense counsel objected and moved to pass the case. The defendant argued that the prosecutor's remarks amounted to a comment on his right to remain silent and also alleged that the prosecutor had vouched for the credibility of Officer Greeno.[5] The trial justice refused to pass the case, but stated that he would give a limiting instruction on both points. Although defense counsel wanted a limiting instruction in the event the trial justice refused to pass the case, he argued nonetheless that he did not think that "there's any instruction that can cure the prejudice that's inured to Mr. Whitfield." In addition to an instruction regarding defendant's right to remain silent, the trial justice instructed the jury that the drawing of inferences and the assessment of credibility is a function exclusively reserved for the jury.

The defendant was found guilty on all counts: assault with a dangerous weapon (beer bottle), assault with a dangerous weapon (shod foot), and simple assault. After trial, defendant moved for a new trial, and the trial justice denied the motion. He was sentenced to four years at the Adult Correctional Institutions with six months to serve and three-and-a-half years suspended

---

[5] The right to remain silent issue is not before us on appeal.

with probation on count 1; four years with six months to serve and three-and-a-half years suspended with probation on count 2, to run concurrently with count 1; and one year suspended with probation on count 3. Additionally, defendant was ordered to complete an anger management program and to pay $5,178.58 in restitution for the victim's medical bills.

## Standard of Review

This Court reviews evidentiary rulings under an abuse of discretion standard. See State v. Tetreault, 31 A.3d 777, 782 (R.I. 2011). A trial justice "has broad discretion in deciding whether or not to admit evidence of prior convictions under Rule 609." Id. (quoting State v. Silvia, 898 A.2d 707, 718 (R.I. 2006)). "'This Court will not disturb a trial justice's finding regarding the admissibility of prior conviction evidence for impeachment purposes unless our review of the record reveals an abuse of discretion on the part of the trial justice' that prejudices the complaining party." Id. (quoting State v. Rodriquez, 731 A.2d 726, 731 (R.I. 1999)).

Similarly, "a decision to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice." State v. McRae, 31 A.3d 785, 789 (R.I. 2011) (quoting State v. Suero, 721 A.2d 426, 429 (R.I. 1998)). This Court defers to the trial justice on such a motion because he or she "has a 'front row seat,' allowing him or her to 'best determine the effect of the improvident remarks upon the jury.'" Id. (quoting State v. Tempest, 651 A.2d 1198, 1207 (R.I. 1995)). "As such, the trial justice's determination concerning the prejudicial effect of evidence and the jury's ability to render a fair and impartial verdict are reviewed by this Court under an abuse of discretion standard." Id.

**Analysis**

**Prior Criminal Convictions**

The defendant argues that the trial justice abused his discretion by allowing the state to impeach his credibility with fourteen prior criminal convictions. The defendant accumulated those fourteen convictions in less than five years after his eighteenth birthday. The convictions include possession of marijuana, operating under the influence of alcohol, resisting arrest, and numerous assaults and batteries, among other offenses. In his ruling, the trial justice considered defendant's "series of crimes"—detailing the different types of offenses involved—and, although he was concerned about the jury's potential consideration of the convictions as propensity evidence, he concluded that the potential danger to defendant could be cured by a limiting instruction at the appropriate time.

"Rule 609 of the Rhode Island Rules of Evidence permits the admission of a witness's prior conviction to attack that witness's credibility unless the court determines that the prejudicial effect of the conviction substantially outweighs its probative value." McRae, 31 A.3d at 791. "In making a determination under Rule 609, a trial justice must consider the remoteness of the conviction, the nature of the crime, and the defendant's disdain for the law as reflected by his or her criminal record." Tetreault, 31 A.3d at 784. Rhode Island's Rules of Evidence do not limit the types of prior criminal convictions that may be admitted to impeach a witness, as opposed to the more limited set of convictions set forth in Rule 609 of the Federal Rules of Evidence, because this Court has declared that "the jury should be able to consider whether or not a person who has previously broken the law may have such disrespect for the law as to render him or her unwilling to abide by the oath requiring truthfulness while testifying." State v. Remy, 910 A.2d 793, 798 (R.I. 2006).

In 2011, this Court decided two cases on nearly the same issue as presented in this case. In Tetreault, 31 A.3d at 781-82, 783, the trial justice allowed the state to impeach the defendant with fifteen prior convictions which spanned sixteen years. On appeal, the defendant argued that eleven of the fifteen convictions were too remote and unduly prejudicial. Id. at 783. We agreed with the trial justice that "given defendant's long and continuous record of criminal behavior throughout most of his adult life, the jury was entitled to consider the proffered convictions." Id. at 784. Accordingly, we upheld the admission of the convictions "[i]n light of the defendant's voluminous criminal record and the probative value of prior convictions as bearing on his credibility as a witness * * *." Id.

In McRae, 31 A.3d at 791, the trial justice allowed the state to impeach the defendant with seven prior convictions. On appeal, the defendant argued that three different categories of prior convictions were inadmissible: convictions involving "assaultive behavior," misdemeanor convictions, and a conviction for obtaining food or accommodations with the intent to defraud. Id. at 792-93. We held that the trial justice did not abuse his discretion as to any of the groups of crimes for impeachment purposes. Id. Specifically, although the defendant was charged with domestic assault, we held that the defendant's prior "assaultive" convictions were no more prejudicial than those admitted in other cases decided by this Court. Id. at 792.

Here, because at the time of trial all of defendant's prior convictions were less than five years old, none of the convictions were remote. While some of defendant's prior convictions were for assault and battery—the same type of offense with which defendant was charged—we repeatedly have declared, most recently in McRae, 31 A.3d at 792, that the similarity of the prior offenses does not render them per se inadmissible for the purpose of impeaching a testifying defendant's character for truthfulness. Finally, although his record was not as lengthy as the

defendant's record in <u>Tetreault</u>, defendant nonetheless displayed his disdain for the law by accumulating fourteen adult criminal convictions before his twenty-third birthday. A crime spree spanning fewer than five years that resulted in fourteen criminal convictions is relevant on the issue of whether a testifying defendant will honor his oath to testify truthfully, given his demonstrated disrespect for the law. Thus, considering the factors set out in <u>Tetreault</u>, the prejudicial effect of evidence of defendant's prior convictions did not substantially outweigh their probative value. In addition, we note that the trial justice gave a limiting instruction to the jury before the prosecutor asked a series of questions about his prior convictions. Accordingly, in these circumstances, the trial justice did not abuse his discretion by allowing the state to impeach defendant's credibility with his prior criminal convictions.

### Motion to Pass

The defendant also argues that the trial justice erred by denying defense counsel's motion to pass the case after the prosecutor allegedly vouched for the credibility of two witnesses during her closing argument. First, we must address whether and to what extent this issue was preserved. To preserve an objection to a prosecutor's closing argument, defense counsel "must not only make an objection at the time, but must make a request for cautionary instructions * * * or move for a mistrial." <u>State v. Horton</u>, 871 A.2d 959, 964 (R.I. 2005) (quoting <u>State v. Portes</u>, 840 A.2d 1131, 1141 (R.I. 2004)).

Although defendant contends that the prosecutor vouched for the credibility of Gonsalves, it is clear that defense counsel made no objection during the prosecutor's remarks concerning Gonsalves. Defense counsel's two objections, posited during closing argument, solely related to the prosecutor's comments about defendant's flight from the scene (which defendant does not contest on appeal) and the prosecutor's comments about Officer Greeno

(which are discussed below).  Therefore, the issue of the prosecutor vouching for Gonsalves is waived.  See Horton, 871 A.2d at 964 (noting that the defendant must object at the time of the comment and either request a cautionary instruction or move for a mistrial to preserve a claim of prejudicial error in a closing argument).

Regarding the prosecutor's remark about Officer Greeno, it is the state's position that the issue was not preserved because defense counsel failed to move for a mistrial or object to the trial justice's cautionary instruction.  Although the state contends that the transcript of the hearing at sidebar is clear on this point, we are not convinced.  The defendant raised two objections in a single, mid-argument sidebar, and each objection separately was argued by counsel.  The trial justice declared that he would give a cautionary instruction as to each objection.  Defense counsel immediately responded, "Just note, Judge, my exception.  I don't think there's any instruction that can cure the prejudice that's inured to Mr. Whitfield."  Because the trial justice's ruling encompassed both of defendant's objections, it is unclear whether defendant's exception related to one objection or to both.  We are cognizant of the setting: the parties and the trial justice were at sidebar, in the midst of a closing argument, during a criminal trial that spanned several days.  A fair reading of defense counsel's remark is that he was objecting to the trial justice's refusal to pass the case and to give a cautionary instruction as to both of his objections.  Therefore, we conclude that the issue was preserved for our review.

Satisfied that the issue properly is before us, we next address whether the prosecutor's comments about Officer Greeno actually constitute vouching for the credibility of a witness.  During closing argument, the prosecutor stated, "Do you think Officer Greeno, who appears, I would suggest to you, to be a very by-the-book officer, he stood there at military attention the whole time that he testified to you, do you think he's going to risk his career?"  This sentence

contains two remarks of questionable appropriateness: the reference to Officer Greeno being a "by-the-book officer" and the reference to the risk to the officer's career, presumably in the event that he gave false testimony. We address the latter instance first.

The proper divide between appropriate remarks about an officer's credibility and improper comments regarding the impact of perjured testimony on an officer's career can be difficult to discern. This tension was highlighted in a decision by the Court of Appeals of Maryland when confronted with the following closing argument by a state's attorney:

> "You have to weigh the credibility of each individual. Who has a motive to tell you the truth. The Officer in this case would have to engage in a lot of lying, in a lot of deception and a conspiracy of his own to come in here and tell you that what happened was not true. He would have to risk everything he has worked for. He would have to perjure himself on the stand.
>     "* * *
> "[Y]ou have to understand that Officer Williams has no motive to lie, because he has everything to risk in this case. Because he doesn't have to go out and make up drug arrests. Because he has plenty of legitimate drug arrests. There's absolutely no incentive for him to come in here and tell a story about Mr. Spain." Spain v. State, 872 A.2d 25, 28, 29 (Md. 2005).

The court's reaction to this argument was twofold. The court first declared that the prosecutor's remarks regarding the officer's motivation to lie did not constitute improper vouching because there was no expression of the prosecutor's personal belief about the credibility of the officer and the comment did not "explicitly invoke the prestige or office of the State or the particular police department or unit involved." Id. at 31. Nevertheless, the court also held that the prosecutor's comments about the adverse consequences to the police officer's career were improper:

> "Although the State is free to highlight the incentive, or lack of incentive, of a witness to testify truthfully, courts consistently have held that it is improper to argue that a police officer may be deemed more credible simply because he or she is a police officer. * * * By invoking unspecified, but assumed, punitive consequences or sanctions that might result if a police officer testifies falsely, a prosecutor's arguments imply that a police

- 12 -

officer has a greater reason to testify truthfully than any other witness with a different type of job. Although the factfinder generally is made aware that a witness who is a police officer is testifying as to events witnessed while on duty as a police officer, a prosecutor must be careful not to insinuate that the credibility of statements made in this capacity may be assessed at a level of scrutiny other than that given to all witnesses." Id. at 32.

We also find the First Circuit's decision in United States v. Torres-Galindo, 206 F.3d 136 (1st Cir. 2000) persuasive and evincive of the sensitivity regarding comments about a government agent's career. In Torres-Galindo, 206 F.3d at 142, the court addressed a comment during closing argument of an Assistant United States Attorney that, if the jury believed a statement by a codefendant, the jury "would also have to believe that [a FBI agent who testified] would actually jeopardize [his] ten years [as an FBI agent]." The First Circuit began its analysis by analyzing whether this remark actually constituted vouching—it contained no statement of personal belief and the FBI agent's service time was in evidence, yet the use of the term "jeopardize" in relation to the agent's career, while falling short of vouching, did suggest "some knowledge outside the record of punishment that [the FBI agent] could receive for lying in court." Id. The court declared:

> "[W]e hold that this kind of general appeal to believe the police or FBI because of their history, integrity, or public service is inappropriate, although not the worst offense that a prosecutor can commit. While not vouching in the most familiar sense, it does invite the jury to rely on the prestige of the government and its agents rather than the jury's own evaluation of the evidence; to this extent, the argument presents the same danger as outright vouching." Id. (citing United States v. Young, 470 U.S. 1, 18-19 (1985)).

Thus, although courts tend to allow a general reference to a specific officer's credibility or lack of motive to lie, a prosecutor's reference to the "risk" to an officer's career should he or she commit perjury is not appropriate. See Torres-Galindo, 206 F.3d at 142; Spain, 872 A.2d at 32; see also United States v. McMath, 559 F.3d 657, 667 (7th Cir. 2009) (holding that

prosecutor's comment that police witnesses would lose their jobs if they lied was improper); People v. Adams, 962 N.E.2d 410, 414 (Ill. 2012) (holding that prosecutor's comment that officer was "risking his credibility, his job, and his freedom" was improper).[6] While a witness's status as a police officer certainly mandates that he or she testify truthfully, we are mindful that, in the context of the criminal justice system, all witnesses are expected to give truthful testimony. We agree with the First Circuit's evaluation that a comment during closing argument about the risk to an officer's career may invite the jury "to rely on the prestige of the government and its agents rather than the jury's own evaluation of the evidence." Torres-Galindo, 206 F.3d at 142. Therefore, in the circumstances of this case, the prosecutor's rhetorical question about whether Officer Greeno would risk his career, while not vouching in the true sense, nonetheless was inappropriate.

Regarding the remaining portion of the challenged remark—"Officer Greeno, who appears, I would suggest to you, to be a very by-the-book officer, he stood there at military attention the whole time that he testified to you"—we perceive no impropriety given the full context of the prosecutor's comment. It is important to note that the prosecutor preceded her comment with "I would suggest," and followed it with a reference to his demeanor on the witness stand: "he stood there at military attention the whole time that he testified to you." It is common to instruct the jury, as occurred here, that they may consider the appearance and

---

[6] Notably, despite holding that the comments were improper, in none of these cases did the appellate court vacate the jury's verdict for this reason. See United States v. McMath, 559 F.3d 657, 668 (7th Cir. 2009) (holding that remark did not jeopardize the fairness or integrity of the trial); United States v. Torres-Galindo, 206 F.3d 136, 142-43 (1st Cir. 2000) (holding that prosecutor's comment was harmless); People v. Adams, 962 N.E.2d 410, 416 (Ill. 2012) (holding that comments did not amount to plain error); Spain v. State, 872 A.2d 25, 34 (Md. 2005) (court was "convinced beyond a reasonable doubt that the error in no way influenced the verdict").

- 14 -

demeanor of a witness when assessing the witness's credibility.[7]  Therefore, considering the whole of the prosecutor's remark and the jury instructions, the argument that Officer Greeno appeared to be a "by-the-book officer" was merely a comment meant to draw the jury's attention to his demeanor while testifying.  Accordingly, that comment was not improper vouching.

Although we conclude that a portion of the prosecutor's closing argument was akin to vouching, we are satisfied that the trial justice did not err by refusing to pass the case.  A trial justice is vested with considerable discretion when ruling on a motion to pass a case.  See McRae, 31 A.3d at 789; State v. Nelson, 982 A.2d 602, 607 (R.I. 2009).  The trial justice's front-row seat at the trial places him or her in the best position to determine the effect of the remarks on the jury and the proper remedy for any prejudice.  See McRae, 31 A.3d at 789.  "As such, the trial justice's determination concerning the prejudicial effect of evidence and the jury's ability to render a fair and impartial verdict are reviewed by this Court under an abuse of discretion standard."  Id.

Here, the trial justice was faced with an objection to a comment that was on the borderline of improper vouching.  In his cautionary instruction, the trial justice told the jury that findings of fact and assessment of credibility were exclusively within their province.  Specifically, he stated,

> "I can assure you that no one, from the State to the defense counsel, to the witnesses, have any inside information.  There is no magical formula with regard to credibility.  The witnesses were sworn to tell the truth; and the assessment of their credibility is exclusively within your prerogative once the final 12 are chosen to deliberate."

---

[7] In this case, the trial justice instructed the jury that they "may be guided by the * * * appearance of a witness, as well as the conduct and demeanor of that witness while testifying * * *."

The Court presumes that members of the jury follow the trial justice's instructions. State v. LaRoche, 683 A.2d 989, 1000 (R.I. 1996). We are satisfied that this cautionary instruction was sufficient to quell the effect of any prejudice caused by the prosecutor's remark about Officer Greeno's career. See Torres-Galindo, 206 F.3d at 142-43 (holding prosecutor's remark harmless because "(1) * * * it was not a severe infraction, (2) * * * the court properly instructed the jury that the statements and arguments of counsel are not evidence, and (3) the substantial weight of the evidence against appellants"); LaRoche, 683 A.2d at 1000 (concluding that instructions "were more than adequate to cure any possible prejudice that may have resulted from the prosecutor's arguably overzealous remarks"); see also supra, note 6 (noting several appellate court decisions refusing to overturn jury verdicts for similar vouching remarks during closing argument). Accordingly, the trial justice did not abuse his discretion in declining to pass the case.

## Conclusion

For the foregoing reasons, we affirm the defendant's convictions. The papers may be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**         State v. Antonio O. Whitfield.

**CASE NO:**         No. 2012-244-C.A.
                              (P2/09-1012A)

**COURT:**         Supreme Court

**DATE OPINION FILED:**  June 30, 2014

**JUSTICES:**         Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**         Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                              Associate Justice William E. Carnes, Jr.

**ATTORNEYS ON APPEAL:**

                              For State:  Christopher R. Bush
                                       Department of Attorney General

                              For Defendant:  Kara M. Maguire
                                       Office of the Public Defender