# United States Court of Appeals
## For the First Circuit

No. 04-1681

UNITED STATES,

Appellee,

v.

ANDREW KORNEGAY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Torruella, Lynch, and Howard,

Circuit Judges.

Eduardo Masferrer, with whom Masferrer & Hurowitz, P.C. was on brief, for appellant.
Timothy Q. Feeley, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, and Theodore B. Heinrich, Assistant United States Attorney, were on brief, for appellee.

June 9, 2005

**HOWARD**, **Circuit Judge**.  Defendant Andrew Kornegay appeals from his conviction and sentence on one count of distributing five or more grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(D).  We affirm.

## I.

We set forth the facts in the light most favorable to the verdict, see United States v. Capozzi, 347 F.3d 327, 328 (1st Cir. 2003), and provide additional facts in our discussion of the legal issues.  In the spring of 2001, an individual named Richard Chaney, a convicted narcotics user, agreed to cooperate with the Bureau of Alcohol, Tobacco, and Firearms (ATF) in identifying narcotics and firearms distributors.  In the summer of 2001, Chaney notified an ATF agent that he had been in contact with Kornegay and could purchase a half-ounce of crack cocaine from him.  Chaney knew Kornegay from their time as cellmates in a Massachusetts jail during early 2001.

The ATF authorized Chaney to make a controlled purchase of crack cocaine from Kornegay.  On August 20, 2001, Kornegay met Chaney on Geneva Avenue in Boston, Massachusetts, entered Chaney's car, and received a $470 payment from him.  Several minutes later, Kornegay returned to the car and gave Chaney over 13 grams of crack cocaine.  The purchase was monitored by audio and video surveillance equipment and was observed by several law enforcement officers.

-2-

Kornegay was not indicted for this sale until April 2003. The ATF delayed apprehending Kornegay because the agency wanted to preserve Chaney as an informant. Meanwhile, Kornegay served a 14-month state sentence for another drug conviction. At trial on the federal charge, Kornegay defended on the ground of mistaken identity. He claimed that his identical twin brother, Andre Kornegay, had sold the drugs to Chaney.

The government met this defense through the introduction of pictures of the Kornegay brothers taken in 2001 and the videotape of the drug deal. Chaney also identified Kornegay based on their time together in prison. Additionally, Boston Police Detective Earl Perkins testified that, in the summer of 2001, he encountered Andrew and Andre Kornegay on several occasions and that he could distinguish them because Andrew had shorter hair and a fuller face than his brother and had fashioned his left eyebrow in a distinctive "three-slash" style. Perkins also identified the individual in the videotape of the drug deal as Andrew Kornegay.

After a five-day trial, the jury convicted Kornegay on one count of distributing five or more grams of crack cocaine. The court calculated Kornegay's sentence range at between 78 and 97 months and sentenced Kornegay to the minimum of 78 months' imprisonment. This appeal followed.

**II.**

Kornegay presses five arguments on appeal. First, he claims that Detective Perkins' identification testimony should have been suppressed because he learned of Kornegay's distinguishing characteristics through unconstitutional investigatory stops conducted by the Boston police during the summer of 2001. Second, he contends that the admission of Detective Perkins' identification testimony violated Federal Rules of Evidence 701 and 403. Third, he argues that the prosecutor prejudicially vouched for Detective Perkins' credibility and appealed to the jury's emotions during the closing argument. Fourth, he posits that the district court erred in denying him certain downward departures under the Sentencing Guidelines. Finally, he asserts that he is entitled to resentencing because the district court erroneously considered the Guidelines mandatory in determining his sentence.

**A.    Motion to Suppress**

Kornegay contends that the district court should have suppressed Detective Perkins' identification testimony as the fruit of several illegal Terry stops conducted by the Boston police during the summer of 2001. See Terry v. Ohio, 392 U.S. 1 (1968) (permitting police to conduct investigatory stops based on reasonable suspicion of criminal activity). The government counters that Kornegay's suppression motion was correctly denied because Kornegay failed to establish a connection between the

allegedly unconstitutional conduct and Detective Perkins' testimony.

In a voir dire before the district court,[1] Perkins testified that, during the summer of 2001, he learned that Kornegay was possibly a drug dealer and that he might be called upon to distinguish Kornegay from his identical twin brother in a subsequent prosecution. Therefore, throughout the summer, Perkins sought opportunities to encounter Kornegay so that he could positively identify him. Perkins testified that, on six occasions, he encountered Kornegay while Kornegay was talking to other police officers.[2] Each time Perkins saw Kornegay, Kornegay was already talking with the police, and therefore Perkins did not know the circumstances which led to the encounter. In particular, Perkins testified that he did not know whether the police had pat-frisked Kornegay and could not remember how many officers were present. Perkins identified the locations where several of these encounters occurred.

Aside from Detective Perkins' testimony, the only evidence before the district court was Kornegay's affidavit

---

[1]Kornegay did not file the motion to suppress Perkins' testimony until after the trial had begun. The court therefore held a hearing on the motion immediately prior to permitting Perkins to testify.

[2]On two occasions, Kornegay was with his twin brother.

-5-

submitted in conjunction with the suppression motion.  In his affidavit, Kornegay stated:

> During the summer of 2001, I was stopped on multiple occasions by members of the Boston Police Department . . . .  I do not recall the names of the officers who stopped me. As many as 4 to 5 officers would approach me without warning and surround me.  They would ask which Kornegay brother I was.  I would identify myself and the officers would then pat-frisk me . . . .  I never felt as if I was free to leave the police officers when they approached me.

Kornegay did not testify concerning the stops or introduce other evidence or witnesses in support of his motion.  After Perkins' testimony and argument, the district court orally denied the motion. Appellate review of a suppression motion is bifurcated.  The ultimate conclusion as to suppression as well as the determination that a given set of facts meets the legal standard for reasonable suspicion are reviewed de novo.  But the trial court's findings of facts are reviewed for clear error.  See United States v. Charles, 213 F.3d 10, 17 (1st Cir. 2000).  "We will uphold a denial of a motion to suppress if any reasonable view of the evidence supports it."  United States v. Mendes-de Jesus, 85 F.3d 1, 2 (1st Cir. 1996).

To succeed on a motion to suppress, a defendant must establish a nexus between the Fourth Amendment violation and the

evidence that he seeks to suppress.[3]  See Alderman v. United States, 394 U.S. 165, 183 (1969); United States v. Finucan, 708 F.2d 838, 844 (1st Cir. 1983); see also United States v. King,  222 F.3d 1280, 1285-86 (10th Cir. 2000); Kandik, 633 F.2d at 1335; 6 W.R. LaFave, Search and Seizure, § 11.2(b) at 50 n.75 (4th ed. 2004) (citing cases).  Kornegay failed to meet this burden.

In his affidavit, Kornegay claimed that he was unlawfully stopped by Boston police officers on several occasions in the summer of 2001.  He did not claim that Detective Perkins was present at these stops.  Nor did he claim that Perkins was a participant in an illegal stop.  If Perkins was merely an uninvolved observer, even to an illegal stop, Kornegay would have no plausible argument. Perkins testified that he saw Kornegay at certain locations after Kornegay was already talking to the police, but that he did not know the circumstances that led to these encounters.  Even after Perkins identified the locations of the encounters, Kornegay failed to produce evidence that any of the stops alluded to in his affidavit were the ones identified by Perkins.  As the district court stated, based on the record before it, it could not conclude that the stops "in the affidavit [were] the same stops that Perkins [was] talking

---

[3]If the defendant meets this initial burden, the evidence will be suppressed unless the government proves that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct.  See United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000); United States v. Kandick, 633 F.2d 1334, 1335 (9th Cir. 1980).

about."  In the absence of proof that Perkins' testimony was based on information gleaned from the allegedly unlawful stops, Kornegay failed to establish the nexus between the claimed Fourth Amendment violation and the evidence he sought to suppress.  See Nava-Ramirez, 210 F.3d at  1131-32 (affirming the denial of a motion to suppress because the defendant failed to show a connection between the allegedly unconstitutional seizure and the evidence he sought to suppress).

**B.    Lay Testimony**

Kornegay next contends that the district court erred by admitting Detective Perkins' identification testimony as a lay opinion under Fed. R. Evid. 701.  We review the district court's ruling for a manifest abuse of discretion.  See United States v. Jackman, 48 F.3d 1, 4 (1st Cir. 1995).

Rule 701 allows for the admission of lay opinion testimony that is "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Kornegay challenges Perkins' testimony under both prongs.  He claims that Perkins' observations during the summer of 2001 were so limited in duration that the in-court identification was not rationally based on Perkins' perception.  He also contends that the testimony was unnecessary because Perkins' observations were brief and the jury had sufficient

other evidence of identity (i.e., photographs and the videotape of the crime) to make the identification.

Based on Perkins' testimony, it is clear that the identification was based upon Perkins' personal observation and the recollection of concrete facts. Perkins described the encounters with Kornegay in detail and provided specific recollections about Kornegay's distinguishing features. This testimony is adequate to establish that the identification was rationally based on Perkins' perception.

The next question is whether Perkins' testimony was helpful to the jury. Here the extent of Perkins' observation is relevant. As we explained in Jackman, identification testimony is helpful to the jury "when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the photographs [of the defendant] are not either so unmistakably clear or so hopelessly obscure that the witness is no better suited than the jury to make the identification." 48 F.3d at 4-5.

Perkins' contact with Kornegay on six occasions within a few months is within the zone that courts have found acceptable to show that the witness was sufficiently familiar with the defendant to provide a useful identification. See, e.g., Beck, 393 F.3d 1088, 1091 (9th Cir. 2005) (affirming identification testimony of a parole officer who met with the defendant four times over two months),

-9-

vacated on other grounds, --U.S.--, 125 S.Ct. 2000 (2005); United States v. Pierce, 136 F.3d 770, 775 (11th Cir. 1998) (affirming identification testimony of an officer who met the defendant ten times over seven months); United States v. Wright, 904 F.2d 403, 404-05 (8th Cir. 1990) (affirming identification testimony of a police officer who had seen the defendant eight times over two years); United States v. Allen, 787 F.2d 933, 935 (4th Cir. 1986) (affirming identification testimony of a parole officer who briefly met the defendant on six or seven occasions), vacated on other grounds, 479 U.S. 1077 (1987). Moreover, Perkins' encounters with Kornegay were for the sole purpose of distinguishing him from his twin brother. Thus, Perkins was no doubt acutely aware of the subtle features of Kornegay's appearance during their several encounters, and, at two of the encounters, he was able to directly compare Kornegay to his twin brother. In light of the circumstances surrounding Perkins' encounters with Kornegay, we have little doubt that Perkins developed a sufficient familiarity with Kornegay to provide a competent identification.

We also conclude that Perkins' testimony was helpful to the jury in making the ultimate identification of the suspect. The visual evidence before the jury was not particularly clear. The videotape of the drug deal was blurry and showed the seller's face for only a few seconds. Thus, it would have been difficult for the jury to attempt to match the photograph of Kornegay with the person

-10-

in the videotape.  See Jackman, 48 F.3d at 5 (permitting identification testimony because the pictures of the robbery suspect were blurred).

The difficulty in making the identification was compounded here because the jury was asked to draw a distinction between identical twin brothers.  Perkins was the only government witness who could testify that he had seen the brothers together near in time to the drug deal.  Given that Kornegay defended by claiming that Andre had sold the drugs to Chaney, a witness who could distinguish the brothers based on personal observations made in the summer of 2001 was, at the very least, helpful.  See Fed. R. Evid. 701(b).  The district court's ruling that Perkins' testimony satisfied the requirements of Rule 701 was not an abuse of discretion.

Kornegay also argues that Perkins' testimony should have been excluded under Fed. R. Evid. 403 as overly prejudicial. Essentially, Kornegay contends that Perkins' familiarity with him derived from a criminal investigation, and therefore the jury likely drew a prejudicial inference from the fact that he was under investigation.

Evidence should be excluded under Rule 403 only where its probative value "is substantially outweighed by its prejudicial effect, that is, by its tendency to encourage the jury to decide the case on improper grounds."  See United States v. Adams, 375 F.3d

-11-

108, 111 (1st Cir. 2004). Trial judges enjoy wide latitude in making Rule 403 rulings and are only overturned after a showing of an egregious error. See id.

Kornegay argues that Perkins' testimony was of little probative value because the photographs of the Kornegay brothers were sufficient for the jury to make the identification and there were other, less prejudicial forms of evidence that the government could have introduced to bolster its case (e.g., fingerprint evidence). Whether the government has alternative means of effectively proving its case without introducing the prejudicial evidence is pertinent to the Rule 403 analysis. See United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000). But, as discussed, because Kornegay accused his identical twin brother of the crime, and because the videotape was of poor quality, the photographic evidence was not sufficiently clear to make the identity testimony unnecessary. Moreover, there is no record support for Kornegay's contention that the government had other identification evidence at its disposal that it could have introduced in lieu of Perkins' testimony.

There was also no prejudice because Perkins did not go beyond identification and did not describe Kornegay's criminal background. Appellate courts have found no substantial prejudice where the trial court has restricted the witness' testimony to limit references to the defendant's criminal background. See, e.g.,

United States v. Stormer, 938 F.2d 759, 763-764 (7th Cir. 1991); Allen, 787 F.2d at 937-38; United States v. Farnsworth, 729 F.2d 1158, 1161 (8th Cir. 1984).

Here, the district court took the necessary precautions. Through the use of leading questions, Perkins testified that he was a police officer but did not specify his duties or responsibilities. He told the jury that he encountered the Kornegays as part of the Boston Police Department's community policing program, which encourages officers to become familiar with the individuals who live in their assigned neighborhood beats. He also told the jury that the encounters in the summer of 2001 were not arrests and did not involve allegations of criminal activity. These precautions were sufficient to limit the potential prejudice from Perkins' testimony.[4]

### C. Closing Argument

Kornegay challenges certain portions of the government's closing argument as improper vouching for the credibility of Detective Perkins. Kornegay cites two statements (which are set out below) in which the government asked the jury to believe Detective Perkins' identification testimony because he was an experienced

---

[4]Kornegay also contends that he was prejudiced because he could not vigorously cross-examine Perkins because he feared that Perkins would offer prejudicial testimony. But Kornegay has not identified specific questions that he would have asked, and our review of the record indicates that Kornegay did aggressively cross-examine Perkins.

police officer who could lose his job or go to jail if he lied on the witness stand.[5]

We have recognized that statements such as these, which arguably ask the jury to believe the testimony of a police officer because of the esteem in which the public holds law enforcement and the risk that a police officer would take by lying in court, are "inappropriate." United States v. Torres-Galindo, 206 F.3d 136, 142 (1st Cir. 2000). On appeal, the government essentially concedes that the challenged statements run afoul of this admonition. It nevertheless contends that the error was harmless.

In Torres-Galindo, we ruled that similar statements were harmless because the statements were not a severe infraction, the court instructed the jury that the statements and arguments of counsel are not evidence, and the evidence against the defendant was

_____

[5]The first statement was:

> The defense want you to believe that Detective Earl Perkins made this up. . . Commit perjury , a detective with 15 years on the Boston Police Department . . . I submit to you that you can tell from examining and watching Earl Perkins that he has better things to do.

The second statement was:

> What's [Kornegay's] claim at base? He's saying, well Earl Perkins came in here and committed perjury and put his job at risk and risked prison and risked all of these things because -- why?

-14-

substantial.  See id. at 142-43.  Each of these factors is present here.

Most importantly, the district court judge provided a curative instruction that was far more explicit than the one which we found sufficient in Torres-Galindo.  In response to Kornegay's objection, the district court told the jury:

> In discussing the testimony of Detective Perkins, [the prosecutor] referred to evidence concerning Mr. Perkins's tenure on the police force in Boston, and he observed that his testimony, if not truthful . . . would put the officer at risk of loss of his job, the risk of committing perjury and going to prison . . . . .
> Now, in his favor, [the prosecutor] pointed out . . . that Detective Perkins' testimony as a police officer stood in the same light as any witness . . . in as far as his credibility is concerned, and I want to emphasize that.
>
> The argument that [the prosecutor] made about risking loss of job and risking perjury might be understood by you to be an appeal to some notion that the officer is entitled to more credibility because he's a police officer. . . . If you are inclined to believe that, that is wrong; you're to judge all the witnesses the same.
>
> [Detective] Perkins gets no special credit because he's a police officer. . . . In so far as there's a risk of going to prison for perjury, everyone who testifies in this courtroom faces the same risk.  I want to point this out to you, just in case there is any [misunderstanding] that [Detective] Perkins is somehow elevated in his credibility because he is a police officer.

Given the strong case presented by the government, the limited nature of the infraction, the court's detailed curative

-15-

instruction, and our presumption that juries follow the court's instructions, see United States v. De Jesus Mateo, 373 F.3d 70, 73 (1st Cir. 2004), we are convinced that the government's inappropriate statements concerning Perkins' testimony were not prejudicial in these circumstances.[6]

### D.        Downward Departures

Kornegay claims that the district court erroneously denied him a downward departure on either of two bases. Both departure arguments relate to the 14-month state drug conviction sentence which Kornegay served after the drug deal at issue in this case but before he was indicted.

The first ground for departure was premised on the government's delay in prosecuting Kornegay in order to protect Chaney from being detected as an informant. Kornegay argued that this delay foreclosed the possibility of his federal sentence running concurrently with his state sentence and that a departure should be granted so that he would not be prejudiced. See United States v. Saldana, 109 F.3d 100, 104 (1st Cir. 1997) (holding that

---

[6]Kornegay also challenges the prosecutors suggestion that, in evaluating the likelihood that Perkins lied, the jury should use common sense and place themselves in the witness' shoes to evaluate his testimony. We discern no error. Kornegay has cited no authority for the proposition that a prosecutor cannot ask a jury to use common sense in evaluating a witness' possible bias. Inherent in such a common sense evaluation is that each juror will place him or herself in the witness' position to judge the witness' motivations based on the juror's notion of typical human behavior.

prosecutorial delay that was "extreme" or "sinister" could support a departure if the defendant was required to serve a state sentence which could have been concurrent with the federal sentence had the federal prosecution proceeded sooner). The district court declined to grant the departure but did not provide a clear reason for its decision.

This court has jurisdiction to review the denial of a request for a downward departure if the court denied the departure as precluded by law. See United States v. Romolo, 937 F.2d 20, 22 (1st Cir. 1991). If, however, the defendant's claim is only that the district court unreasonably declined to exercise its discretion to grant a departure, we may not review it. See id. On the record before us, it is not clear whether the court declined the Saldana departure as a matter of law or discretion. In such circumstances, absent information in the record suggesting otherwise, we assume that the court understood that it could depart but decided not to do so as a matter of discretion. See United States v. Lujan, 324 F.3d 27, 32 (1st Cir. 2003); see also United States v. Scott, 387 F.3d 139, 143 (2d Cir. 2004); United States v. Williams, 355 F.3d 893, 901 (6th Cir. 2003); United States v. Heredia-Cruz, 328 F.3d 1283, 1289-90 (10th Cir. 2003); United States v. Chase, 174 F.3d 1193, 1195 (11th Cir. 1999).

Kornegay asserts that the district court believed that it did not have the authority to grant the departure based on its

statement that "if I look at all the relevant material, I cannot find that this departure is authorized." But this statement was clearly related to Kornegay's other departure request (which we discuss infra) and not the Saldana request. As there is no basis on which to conclude that the district court believed it was legally precluded from granting a Saldana departure, we may not review its decision to deny the departure. See Scott, 387 F.3d at 143.

Kornegay's second ground for departure was premised on his belief that the district court should have reduced his sentence to account for the time that he served for the state drug conviction because it was conduct related to the present offense. Kornegay premises his argument on § 5G1.3(c) in the 2000 version of the Sentencing Guidelines.[7] The government responds that the 2003 Guidelines apply to this case and, under the relevant section of those Guidelines, § 5K2.23, Kornegay was legally precluded from the departure because the state sentence did not result in an increased offense level for the federal conviction. For this request, the district court ruled that it could not grant the

---

[7]Section 5G1.3(c) provides that a defendant's sentence may run concurrently with an undischarged term of imprisonment for conduct that is related to the instant offense. Kornegay contends that this provision should be read broadly to authorize a downward departure where the defendant has completed a term of imprisonment for conduct related to the instant offense.

departure as a matter of law.  Our review is therefore <u>de novo</u>. <u>United States</u> v. <u>Grandmaison</u>, 77 F.3d 555, 560-61 (1st Cir. 1996).

To evaluate Kornegay's claim, we must first determine which version of the Guidelines apply.  The general rule is that the version of the Guidelines in force at the time of sentencing applies -- here, the 2003 Guidelines.  <u>See</u> U.S.S.G. § 1B1.11.  If, however, applying the most recent Guidelines version creates an <u>ex post facto</u> problem, the court applies the Guidelines in force at the time of the offense -- here, the 2000 Guidelines.  <u>See</u>  <u>id.</u> § 1B1.11(b)(2).  Kornegay has not made an <u>ex post facto</u> argument to justify his assertion that the 2000 Guidelines apply.  He has therefore forfeited any claim for applying the earlier Guidelines version.  <u>See</u> <u>In re Gosselin</u>, 276 F.3d 70, 72 (1st Cir. 2002); <u>see also</u> <u>Prewitt</u> v. <u>United States</u>, 83 F.3d 812, 820-21 (7th Cir. 1996) (stating that defendant forfeited <u>ex post facto</u> claim for applying earlier version of the Guidelines by not raising the argument before the district court).

Under the 2003 Guidelines, § 5K2.23 provides that a downward departure may be appropriate if the defendant has completed a term of imprisonment and the completed sentence was for a crime that was relevant conduct for the instant offense <u>and</u> <u>was the basis for an increase in the offense level for the instant</u> <u>offense</u>.  Kornegay meets the first two conditions for eligibility for this departure, but the offense level was not increased as a

result of considering the earlier conviction.  The district court therefore correctly denied the § 5K2.23 departure request.  <u>See</u> <u>United States</u> v. <u>Ramanauskas</u>, No. 04-04PAM, 2005 WL 189708 at *1 (D. Minn. Jan. 21, 2005) (denying § 5K2.23 departure on this basis).

### E.     Booker Issue

Finally, we address Kornegay's claim that he is entitled to resentencing because the district court erroneously considered the Guidelines as mandatory in assigning his sentence.  <u>See</u> <u>United</u> <u>States</u> v. <u>Booker</u>,  525 U.S --, 125 S. Ct. 738 (2005) (declaring the Guidelines advisory to preserve their constitutionality). Kornegay conceded at oral argument that he did not preserve this argument for appeal, and therefore we review it under the plain error test.  <u>See</u> <u>United States</u> v. <u>Antonakopoulos</u>, 399 F.3d 68, 76-77 (1st Cir. 2005).  This test is met only where the defendant can demonstrate a plain error that affects substantial rights, and seriously affects the fairness, integrity or public reputation of judicial proceedings. <u>See</u> <u>id.</u> at 77.

Kornegay has met the "plain error" portion of the test by showing that the district court treated the Guidelines as mandatory.  <u>See</u> <u>id.</u>  To meet the "affects substantial rights" prong of the test, Kornegay must show "a reasonable probability" that the district court would impose a more favorable sentence under the now advisory Guidelines.  <u>Id.</u> at 75.  We are not "overly

demanding as to proof of [such] probability where, either in the existing record or by plausible proffer, there is a reasonable indication that the district court judge might well have reached a different result under advisory guidelines." United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005).

Even applying this relaxed standard, Kornegay has not established a reasonable probability that the district court might have given him a lesser sentence under advisory Guidelines. Nothing about the district court's comments at sentencing indicates that it thought that Kornegay's sentence was too harsh. That the court sentenced Kornegay at the low end of the applicable Guideline range is not, by itself, sufficient to show a reasonable probability of a lesser sentence under the advisory system. See United States v. Figuereo, 404 F.3d 537, 541-42 (1st Cir. 2005); United States v. Cacho-Bonilla, 404 F.3d 84, 95 (1st Cir. 2005).

Kornegay has suggested that he should be resentenced because, after Booker, there is a broader range of factors that a court may consider in fashioning a reasonable sentence. Although that is true, Kornegay has not proffered to this court any "specific facts" concerning his case that he would present on remand. See Antonakopoulos, 399 F.3d at 80. Without identifying such facts, Kornegay has not met his burden of demonstrating that the application of the mandatory Guidelines affected his substantial rights.

## III.

For the reasons stated, we **<u>affirm</u>** Andrew Kornegay's conviction and sentence.