# United States Court of Appeals
## For the First Circuit

No. 04-1700

UNITED STATES OF AMERICA,

Appellee,

v.

GEORGE WASHINGTON, a/k/a ANTHONY LONG,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Selya and Lynch, Circuit Judges,
and Smith,[*] District Judge.

William Maselli for appellant.
F. Mark Terison, Senior Litigation Counsel, with whom Paula
D. Silsby, United States Attorney, was on brief, for appellee.

January 6, 2006

---

[*]Of the District of Rhode Island, sitting by designation.

**LYNCH**, **Circuit Judge**.  George Washington, a resident of Maine who also goes by the name Anthony Long, sold cocaine base to a police informant in Lewiston, Maine, on April 15, 2003 and again on April 23, 2003.

Washington was charged with two counts of distribution of five or more grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).  Washington's co-defendants Nicholas Blake, John Brown, and Alvin Jackson were also charged with various violations of the federal drug laws; they pled guilty.  After a jury trial, Washington was convicted of both counts; the jury specifically found that the amount of cocaine base was five or more grams for each count.  Because Washington had prior felonies on his record, including violent felonies and a prior conviction for possession of cocaine with intent to distribute, he was sentenced as a career offender, see U.S.S.G. § 4B1.1, to concurrent prison terms of 360 months on each count.  This was the minimum Guidelines sentence; he could have been sentenced to life imprisonment.  See 21 U.S.C. § 841(b)(1)(B); U.S.S.G. § 4B1.1.

**I**

Washington appeals from his conviction and from his sentence.  As to his sentence, he argues it should be vacated and remanded for resentencing in light of United States v. Booker, 125 S. Ct. 738 (2005).  The government has agreed to this remand, and so we vacate the sentence and remand for resentencing.

This leaves Washington's challenges to his conviction. The challenges are of two kinds: The first has to do with the evidence. Washington argues that certain evidence was erroneously admitted and the error was so prejudicial as to deny him a fair trial. He also argues that the evidence, which in his view was not credible, was insufficient to support the conviction. Second, Washington attempts to reargue a complaint about the racial composition of his jury panel which he had presented pro se to the district court. A brief description of the case suffices to set the stage.

A.    Background

Washington was convicted upon the testimony of a government informant, Toby White, to whom Washington sold over 35 grams of crack on two different days (12.8 grams on the first occasion and 23.7 grams on the second), as well as on the testimony of law enforcement agents and cooperating co-defendants, audiotapes of the two transactions, and associated telephone calls.

The first transaction was on April 15, 2003 at 20 Knox Street, Apartment 301, in Lewiston. There, while DEA Agent Genese waited in the car, informant White purchased from Washington 12.8 grams of cocaine for $700. White had not met Washington before. In fact, White had tried to buy cocaine earlier from co-defendant Alvin Jackson, who had none, and who had turned to Washington, by way of Brown and Blake, to provide a supply. Washington and

another man, whom White understood to be Washington's cousin, personally handed the cocaine to White. Washington also gave White his phone number so White could "contact him directly next time" about buying drugs. Washington and the cousin also told White that "the next time" the price would be $800. During this transaction, Washington went by the name "Tony." White reported the details of the transaction to Agent Genese, including that he had obtained the cocaine from two black men and that the one who sold him the drugs was named "Tony."

The "next time" came soon, on April 23, 2003. White had called Washington to buy more drugs, and they had agreed to meet on April 23 at Washington's apartment at 67 Pierce Street in Lewiston. This time White purchased 23.7 grams of crack cocaine from Washington for $1300.

The principal, but not sole, defense theory was that someone named "Tony" may very well have sold the drugs, but that Washington was not that "Tony." There was defense evidence that Washington was in Massachusetts on April 23 and so he could not possibly have been the same "Tony" who sold the drugs to White that day. But the prosecution had evidence that on April 23, shortly after the transaction, Lewiston police officer Wayne Clifford visited Washington's apartment on a ruse. The man whom Clifford recognized as "Anthony Long" came to the doorway, identified himself as Anthony Long, and confirmed that no other black man

lived in the apartment or had stayed there that day.  Clifford made an in-court identification of the man he saw that day as the defendant, Washington.  White, too, made an in-court identification of Washington as the man who had sold him cocaine.

Washington and others were arrested on June 3, 2003. Washington identified himself as Anthony Long when he was arrested.

The jury was played the audiotapes of the April 15 and April 23 transactions, as well as tapes of conversations between Washington and White setting up the April 23 deal.

Washington focuses on the fact that the jury was also played audiotapes of eight telephone conversations between White and Jackson that occurred on April 13, 14, and 15.  In these conversations, White and Jackson discussed a potential drug deal, which ultimately came to be the April 15 transaction.  The two also engaged in casual conversation about a variety of other subjects. Washington did not participate in these conversations and was not mentioned by either his real name or his alias.  The prosecution did not intend to introduce the tapes of the April 13 and 14 conversations, but did so because the defense wanted the tapes in evidence.[1]

---

[1] At a pretrial motion hearing, the prosecutor said:

> I was originally intending to only introduce the call on the 15th which led to the buy because much of the conversations on the 13th and 14th are completely unrelated to what ultimately happens.

-5-

The prosecutor said that she would not object to the admission of all the conversations, but she did object to a few sentences at the beginning of the first conversation. In the government's view, this portion, in which White and Jackson discuss women in a derogatory manner, was inflammatory, might offend the jurors, and should be excised. The defense objected to the redaction, but not to the playing of the tapes. On the contrary, defense counsel insisted that the calls of April 13, 14, and 15 between White and Jackson be played in their entirety.[2] The defense stated that these calls demonstrated that White was deceitful and not credible; he was a bad person and a poseur, and he should not be trusted in what he said. Over defense counsel's objection, the court redacted the sentences as to which the prosecution had objected. Both sides stated that they had no further objections.

---

> From my perspective, I didn't think that I would push the admissibility of those. However, [defense counsel] wants the jury to hear the conversations between Mr. Jackson and Mr. White on the 13th and 14th.

[2] Defense counsel did not explicitly list each date in his argument for admissibility, and the prosecutor had not objected to the calls between White and Jackson on the morning of April 15. But in the context of the entire conversation among the court, the prosecutor, and the defense, as well as the fact that the exhibit then under discussion contained all the conversations from April 13 through April 15, it is clear that defense counsel's argument that "the jury should hear [the non-drug-related conversation]" and that he "want[ed] it all in" referred to all three dates, not just April 13 and 14.

At trial, the slightly redacted tapes of the April 13, 14, and 15 conversations between White and Jackson were played for the jury, with defense counsel interjecting expressly to say that he had no objection and "[t]hat's fine."

B.        Challenges to Admission of Evidence

Most of Washington's evidentiary objections were waived or forfeited; one, described later, was preserved.

1.        Waived Challenge to Telephone Calls

It will be no surprise that we reject Washington's appellate claims of error based on those audiotapes which the defense had admitted into evidence for its own tactical reasons. Washington now argues on appeal that the conversations between White and Jackson leading up to the sale on April 15 "established an unsavory prejudicial tone which could not but damage [Washington] before the jury."  The tapes were admitted because Washington's trial counsel made a deliberate strategic choice that the tapes should be admitted to establish an unsavory tone, which would damage White, the government's chief witness, before the jury.  This is classic waiver, and we will not even consider the argument.  See United States v. Olano, 507 U.S. 725, 732-33 (1993) (stating that there is no error where the deviation from a legal rule has been waived, and defining waiver as "the 'intentional relinquishment or abandonment of a known right'" (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938))); United States v. Mitchell,

-7-

85 F.3d 800, 807-08 (1st Cir. 1996) (where defense affirmatively agreed to government's proposed use of evidence, waiver occurred, and plain error review does not apply).

### 2. Forfeited Challenges to Various Evidence

Several other pieces of evidence now resurrected for appeal were also admitted without objection, and so the objections were forfeited. See Olano, 507 U.S. at 731, 733; Mitchell, 85 F.3d at 807. These forfeited claims involve evidence of a prior arrest, statements of co-defendants, and the tape recording of the April 15 transaction. For this court to correct a forfeited error, there must be an error, it must be plain, it must affect substantial rights, and it must seriously affect the fairness, integrity, or public reputation of judicial proceedings. Olano, 507 U.S. at 732. On appeal, Washington invokes the plain error rule, to no avail.

Washington argues that it was plain error to allow a police officer who had arrested him to testify about an earlier arrest and to explain that that arrest was for something other than the inspection sticker violation which caused the officer to stop Washington's car. The first reference to an arrest came during direct examination by the prosecution.[3] Defense counsel did not

---

[3] On direct examination, Officer Clifford testified that about a month after visiting Washington's apartment on a ruse on April 23, he "made contact with Mr. Long, reference a traffic stop where he was arrested for some traffic violations. And he was again . . . positively identified by me as the same subject" with whom Clifford had spoken on April 23. The prosecution asked whether this was an "expired inspection sticker stop," and Clifford said it

object during direct examination, move to strike during cross examination,[4] or seek a limiting instruction.

Washington asserts that Officer Clifford's testimony about the arrest was prior bad acts evidence, and that it was impermissible under Fed. R. Evid. 404(b), which provides, in part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence may, however, "be admissible for other purposes, such as proof of . . . identity." Id. Prior bad acts evidence offered for these other purposes must be "specially probative of an issue in the case . . . without including bad character or propensity as a necessary link in the inferential chain." United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996). Even if the evidence has special relevance (such

---

was. He also said that the person stopped -- identified in court as the defendant -- gave his name as Anthony Long.

[4] Washington also takes issue with a statement elicited by the defense. On cross-examination, defense counsel said, "Now when you arrested this person you knew to be Anthony Long about a month later for an inspection sticker violation, did you -- " whereupon Clifford interjected, "He wasn't actually arrested for the inspection violation, that was just the reason for the stop." Counsel replied "I see," and he continued with his original line of questioning. There was no motion to strike. On appeal, Washington argues that Clifford's interjection exacerbated the problem, but he does not adequately explain how there was any unfair prejudice, see United States v. Varoudakis, 233 F.3d 113, 121-23 (1st Cir. 2000) (articulating prejudice analysis as applied to prior bad act evidence not barred by Fed. R. Evid. 404(b)), or how the court's failure to strike the clarification sua sponte amounted to plain error under Fed. R. Evid. 403 or 404(b).

-9-

as proof of identity), it is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. Id.

The evidence of the stop and arrest was material to identity and was offered for precisely that purpose: the jury heard that Washington had been stopped and arrested under the name "Anthony Long." Officer Clifford's testimony connected Washington not only to 67 Pierce Street, but also to the name "Anthony Long" and its variant, "Tony." "[E]vidence of prior bad acts may be probative even when it is relevant to an issue that the defendant does not contest," United States v. Varoudakis, 233 F.3d 113, 121 (1st Cir. 2000), and all the more so here, where Washington's defense was largely based on a claim of mistaken identity.

Washington also argues on appeal that there was plain error in the admission of testimony about statements made by some of his co-venturers. He argues that three unobjected-to portions of White's testimony constituted inadmissible hearsay:[5] White testified that Jackson told him he had no drugs at the moment and would find another source; that to facilitate the April 15 transaction, Brown told Agent Genese that Jackson was "upstairs" at 10 Knox Street, that Brown would go to 20 Knox Street, Apartment 301, and that Genese should send Jackson over there when Jackson

---

[5] Washington also points to a fourth item. He claims White testified that he told Agent Genese that he had met with two individuals concerning the cocaine transaction: Washington and his cousin. For this proposition, Washington cites only to a part of the record containing Genese's, not White's, testimony.

came down; and that Blake told White he would set up the deal with another supplier -- Washington.[6]

Under Fed. R. Evid. 801(d)(2)(E), "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is "not hearsay." Washington correctly notes that no conspiracy was charged. From this, he argues that the evidence was not admissible, although he concedes that "some of these statements would have been admissible in the context of an alleged conspiracy." Cf. Pinkerton v. United States, 328 U.S. 640, 646-47 (1946) (stating that acts in furtherance of a conspiracy are attributable to other members of the conspiracy for purposes of holding them responsible for the substantive offense).

But we have already rejected the argument that a Pinkerton theory must be expressly charged in the indictment:

> It is well established that the applicability of the "co-conspirator" exception to the hearsay rule is not conditioned on the presence of a conspiracy count in the indictment. Rather, the out-of-court statements of one "partner in crime" will be admissible against a confederate when made in furtherance of a joint criminal venture and when there is sufficient evidence independent of these statements to indicate the existence of such a venture.

---

[6] Washington's characterization of White's testimony about Blake is not entirely accurate. White testified not that Blake said he would set up a deal, but rather that White asked Blake "what he could do for me, how much it was going to be, and how long before the drugs was going to be there," and that White then overheard Blake in fact setting up a deal by telephone.

-11-

Ottomano v. United States, 468 F.2d 269, 273 (1st Cir. 1972); see also United States v. Candelaria-Silva, 162 F.3d 698, 706 (1st Cir. 1998); United States v. Campa, 679 F.2d 1006, 1011 (1st Cir. 1982). This court has treated statements of joint venturers in a criminal scheme as equivalent to statements of co-conspirators for purposes of application of Fed. R. Evid. 801(d)(2)(E). See, e.g., United States v. Kaplan, 832 F.2d 676, 685-87 (1st Cir. 1987); United States v. Fortes, 619 F.2d 108, 117 (1st Cir. 1980).[7] It was not plain error to admit the statements of Jackson, Brown, and Blake -- all defendants in this case -- as statements of joint venturers in furtherance of the joint criminal venture of the April 15 sale of cocaine base.

Washington also challenges, on appeal, the admission of the tape of the April 15 transaction itself.[8] Washington's arguments as to each statement are so factually sparse and so legally conclusory that they amount to waiver -- there is simply no

_____

[7] The history of the Rule reflects this understanding. See Fed. R. Evid. 801 advisory committee's note ("[T]he rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged." (citing S. Rep. No. 93-1277, as reprinted in 1974 U.S.C.C.A.N. 7051, 7073)).

[8] According to Washington's summary of the tape, Agent Genese narrates the action visible from the car, White and Jackson discuss Jackson's time in jail, Jackson tells Genese that "he" (apparently "Tony") wants $700 for the cocaine, Genese has an annoyed reaction to that news, Brown and Blake appear, White makes a comment to Genese identifying Blake as "Black and Puerto Rican" and "the hook up," and White and "Tony" converse.

-12-

sufficiently developed claim of error for this court to review. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In any event, there was no objection at trial on the grounds of hearsay or unfair prejudice, so, at most, we review for plain error. We find none.[9]

### 3.        Preserved Challenge to Testimony

We turn last to the evidentiary challenge that Washington did preserve: he raised a hearsay objection to Agent Genese's testimony that White told him on April 15 that the name of the person from whom he had purchased cocaine was "Tony." We review for abuse of discretion the district court's decision to admit this evidence over the hearsay objection. See United States v. Alzanki, 54 F.3d 994, 1008 (1st Cir. 1995).

Under Fed. R. Evid. 801(d)(1)(B), a prior statement by a witness is "not hearsay" if "[t]he declarant testifies at the trial . . . and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge

---

[9] Washington generally condemns the tape as containing irrelevant, prejudicial, and hearsay evidence. It was not plain error to admit, as statements of joint venturers in furtherance of the joint criminal venture, the statements Washington portrays as hearsay. See Fed. R. Evid. 801(d)(2)(E). And the prejudice of the statements with which Washington takes issue is not self-evident. If any of the statements on the tape were even prejudicial, there was no plain error in finding that their probative value (in providing context for the April 15 transaction) was not substantially outweighed by the danger of unfair prejudice. See Fed. R. Evid. 403.

against the declarant of recent fabrication or improper influence or motive." When defense counsel objected to Genese's testimony about White's prior statement, the prosecution invoked this rule. Specifically, the prosecution argued that in light of the previous cross-examination of White, in which defense counsel had suggested that White was lying when he gave testimony on direct examination,[10] Genese should be allowed to testify about White's prior consistent statement. The district court agreed.

On appeal, Washington argues that "there was never an express or implied charge of fabrication as to whether it was 'Tony' who sold the cocaine to White: the only aspect challenged was whether 'Tony' was in fact . . . George Washington." The district court agreed with the prosecution that there was a charge of fabrication which went to all of White's testimony, including his testimony about the name of the drug dealer.[11] This was a fair

---

[10] On direct examination, White had testified that one of the men in Apartment 301 -- the one who, with a cousin, ultimately sold him the cocaine -- was introduced to him as "Tony." White had also made an in-court identification of that person as the defendant, Washington. White also testified that as soon as he left the apartment on April 15, he told Genese that the two men from whom he had purchased the cocaine were coming downstairs right behind him, and that "a few seconds later, Tony and his cousin" did indeed exit 20 Knox Street.

[11] On cross-examination of White, defense counsel implied that part of White's motivation for working with the DEA on drug cases was to get the DEA's help with other charges pending against him and to get money. After White confirmed that he'd already been paid more than $18,000 for his work for the DEA, counsel asked, "[n]ow you would lie, wouldn't you, about pending cases in order to keep working for the DEA?" Counsel then engaged in a lengthy

interpretation of the cross-examination.  Defense counsel had suggested that the _entirety_ of White's testimony on direct examination had been false, implying not only that White did not get a good look at the "real" drug dealer, but also that White was a habitual liar and that he had a motive to lie about anything and everything in order to please the DEA.  There was no abuse of discretion under Fed. R. Evid. 801(d)(1) in allowing Genese to testify about White's prior statement to the effect that one of the men who sold the cocaine was named "Tony."

C.        Challenge to Sufficiency of the Evidence

Washington argues that insufficient credible evidence supported the jury verdict finding him guilty on two counts of possessing cocaine with intent to distribute.  We treat as preserved Washington's claim that the evidence was insufficient as to both the April 15 and April 23 transactions.[12]  We review de novo, see United States v. Rodriguez-Casiano, 425 F.3d 12, 14 (1st

course of questioning about White's history of dishonesty and criminality, and got White to agree that various things he had said or done in the past had involved lies.  Counsel then asked White to confirm that during the transactions on April 15 and 23, White had been with "this person you called Tony for a very, very short period of time."  White agreed, and he also agreed that during part of the April 23 transaction, he had been counting money and weighing and inspecting drugs.

[12] Washington arguably preserved the claim only as to the April 15 count, but the government does not press the point, and any failure to preserve is without effect, given that Washington's argument fails even under the more searching standard of review for preserved claims.

-15-

Cir. 2005), inquiring whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," United States v. Casas, 356 F.3d 104, 126 (1st Cir. 2004) (quoting United States v. Henderson, 320 F.3d 92, 102 (1st Cir. 2003)). All "reasonable evidentiary inferences" are to be drawn "in harmony with the verdict," and "all issues of credibility" are to be resolved "in the light most favorable to the government." Id.

The prosecution's evidence has already been detailed, and it is more than adequate to support the conviction. Washington argues that White was "highly impeached" and that the testimony of various witnesses was inconsistent in "critical aspects," but the jury was entitled to believe the basic story testified to by each of the government's witnesses.

As for White's credibility, defense counsel had ample opportunity to, and did in fact, point out his receipt of government money and his history of questionable behavior. The jury nevertheless found White credible, and this "plausible credibility determination[] cannot be disturbed on appeal." United States v. Soto-Beniquez, 356 F.3d 1, 52 (1st Cir. 2003); see also United States v. Torres-Galindo, 206 F.3d 136, 140 (1st Cir. 2000) (rejecting defendant's argument that the witnesses were "bad people who should not be believed," where "the jury was presented with

substantial evidence of the criminal histories of [those witnesses], including ample cross-examination"). The jury was also entitled to believe the other government witnesses' "version of the facts, at least in its core elements." Torres-Galindo, 206 F.3d at 140. The testimony of the cooperating co-defendants was corroborated at trial, and Washington has, at most, pointed out minor inconsistencies that fall far short of rendering the testimony facially incredible. See id. (stating that even "the uncorroborated testimony of a cooperating accomplice may sustain a conviction so long as that testimony is not facially incredible").

D.        Challenge to Composition of the Jury

We do not discuss the merits of the jury composition claim, which was not properly raised before the district court.[13] While counsel did deliver Washington's pro se challenge to the

_____

[13] Although represented by counsel at trial, Washington himself, at the beginning of the jury selection process, presented a written objection to the jury array by having his attorney give the court a letter he had written. In the letter, Washington argued that the jury selection process had not resulted in a "fair and representative cross-section" of the community, because there were no African Americans included in the jury array, although approximately 8000 African Americans live in Cumberland County, Maine. Washington is African American.
The magistrate judge conducting jury selection at first accepted the written objection. Later, the trial court struck the objection because it was filed by appellant pro se at a time when he was already represented by counsel. The court stated that Washington "has a right to be represented by a lawyer or a right to proceed pro se, [but] he does not have the right to do both simultaneously." The court ordered that Washington "proceed through his lawyer unless and until he is permitted to proceed without a lawyer." Washington's attorney declined to pursue an objection to the jury selection process.

court, it was clear he did so as a mere accommodation to his client. Counsel's refusal to file the objection as counsel of record no doubt reflected an assessment of counsel's ethical responsibilities not to file unsupported motions.

Washington was represented at trial by counsel. He did not seek leave to proceed in some sort of hybrid arrangement with counsel or to proceed entirely pro se. Cf. United States v. Betancourt-Arretuche, 933 F.2d 89, 92 (1st Cir. 1991) (waiver of right to counsel must be, inter alia, knowing and intelligent as well as clear and unequivocal). At most, his filing of a pro se motion (in fact, more than one) while he was still represented by counsel -- and evidently happily so -- constituted a sort of implicit request to be treated as co-counsel.

But district courts have "discretion to deny hybrid representation outright." United States v. Nivica, 887 F.2d 1110, 1121 (1st Cir. 1989); see also Betancourt-Arretuche, 933 F.2d at 95 (stating that defendant could have "utilize[d] some sort of hybrid representation if it were approved by the court" (emphasis added)). In Nivica, this court explained:

> An indigent defendant has a sixth amendment right to appointed counsel, and a corresponding right to proceed without counsel, but these are mutually exclusive. A defendant has no right to hybrid representation. That is not to say that hybrid representation is foreclosed; rather, it is to be employed sparingly and, as a rule, is available only in the district court's discretion.

-18-

887 F.2d at 1121 (citations omitted).

Moreover, had Washington sought leave to act as co-counsel, the district court would have had discretion to "place reasonable limitations and conditions upon the arrangement." Id.; see also United States v. Gomez-Rosario, 418 F.3d 90, 96-99 (1st Cir. 2005). In this case, the district court was not required to accept Washington's pro se motion at all. The court acted within its discretion in striking the motion.

Whether a jury has been drawn from a fair cross-section of the community is a complicated question, one that requires sensitive analysis of many facts. See, e.g., In re United States, 426 F.3d 1, 9 (1st Cir. 2005); United States v. Royal, 174 F.3d 1, 6 & n.2 (1st Cir. 1999) (discussing elements of prima facie case of violation of fair cross-section requirement and stating that government can rebut prima facie case by another showing). As Washington himself concedes, his "contentions were never . . . subjected to proof," and his motion offered none.

**II**

Washington's conviction is affirmed. His sentence is vacated and the matter is remanded under Booker, 125 S. Ct. 738, to the district court for resentencing. We intimate no view about the appropriate sentence to be imposed on remand.